| Case No. | 2:13-cr-00484-CAS – 1, 3, 5, 6 & 10 | Date | February 13, 2019 |
|---|---|---|---|
| Present: The Honorable | CHRISTINA A. SNYDER | | |
| Interpreter | N/A | | |

| Catherine Jeang | Not Present | J. Mark Childs, Not Present<br>Christopher Kendall, Not Present<br>Michael Freedman, Not Present |
|---|---|---|
| *Deputy Clerk* | *Court Reporter / Recorder, Tape No.* | *Assistant U.S. Attorneys* |

| U.S.A. v. Defendant(s): | Present | Cust. | Bond | Attorneys for Defendants: | Present | App. | Ret. |
|---|---|---|---|---|---|---|---|
| Jose Rodriguez-Landa | NOT | X | | Carlo Spiga | NOT | | X |
| | | | | Nicholas Rosenberg | NOT | | X |
| Fred Anthony Montoya | NOT | X | | Carlos Iriate | NOT | X | |
| | | | | Kristen Richards | NOT | X | |
| Luis Gerardo Vega | NOT | X | | Mark Windsor | NOT | X | |
| Manuel Larry Jackson | NOT | X | | Amy Jacks | NOT | X | |
| Sonia Apodaca | NOT | | X | Humberto Diaz | NOT | X | |

**Proceedings:**     (IN CHAMBERS) - THE GOVERNMENT'S MOTION IN LIMINE TO ADMIT EVIDENCE PERTAINING TO DEFENDANTS JOSE RODRIGUEZ-LANDA AND SONIA APODACA (Dkt. [ 784 ], filed on August 17, 2018)

THE GOVERNMENT'S MOTION IN LIMINE TO ADMIT EVIDENCE PERTAINING TO DEFENDANT MANUEL LARRY JACKSON (DKT. [ 789 ], filed on August 17, 2018)

THE GOVERNMENT'S MOTION IN LIMINE TO ADMIT DEFENDANT MONTOYA'S 2001 METHAMPHETAMINE CONVICTIONS (DKT. [ 791 ], filed on August 17, 2018)

THE GOVERNMENT' MOTION IN LIMINE TO ADMIT EVIDENCE OF PRIOR CONVICTIONS PURSUANT TO FEDERAL RULE OF EVIDENCE 609 (Dkt. [ 787 ], filed on August 17, 2018)

**[UNDER SEAL]** THE GOVERNMENT'S MOTION IN LIMINE TO PRECLUDE CALLING CS1 FOR THE PRIMARY PURPOSE OF IMPEACHING HIM (DKT. [ 786 ], filed on August 17, 2018)

**[UNDER SEAL]** THE GOVERNMENT'S MOTION IN LIMINE TO PRECLUDE IMPROPER IMPEACHMENT OF COOPERATING WITNESSES (DKT. [ 785 ], filed on August 17, 2018)

THE GOVERNMENT'S MOTION IN LIMINE TO PRECLUDE QUESTIONING ON MATTERS SUBJECT TO THE LAW ENFORCEMENT SENSITIVE QUALIFIED EVIDENTIARY PRIVILEGE (DKT. [ 788 ], filed on August 17, 2018)

THE GOVERNMENT'S MOTION IN LIMINE TO PRECLUDE (1) ADMISSION OF ANY LATE OR UNDISCLOSED RECIPROCAL DISCOVERY AND (2) ADMISSION AT TRIAL OF ANY UNNOTICED AFFIRMATIVE DEFENSES (DKT. [ 790 ], filed on August 17, 2018)

THE GOVERNMENT'S MOTION IN LIMINE TO PRECLUDE THE INTRODUCTION OF INADMISSIBLE HEARSAY (DKT. [ 792 ], filed on August 17, 2018)

DEFENDANTS' MOTION FOR ADDITIONAL PEREMPTORY CHALLENGES (DKT. [ 860 ], filed on January 13, 2019)

DEFENDANTS' MOTION FOR PRELIMINARY JURY INSTRUCTION (DKT. [ 861 ], filed on January 13, 2019)

DEFENDANTS' REQUEST FOR NOTICE OF PROPOSED TRIAL LOGISTICS (DKT. [ 862 ], filed on January 13, 2019)

DEFENDANTS' MOTION IN LIMINE FOR ADVANCED NOTICE OF THE GOVERNMENT'S EXHIBITS, WITNESSES TO BE CALLED, AND TOPICS TO BE COVERED DURING A TRIAL WEEK (DKT. [ 873 ], filed on January 13, 2019)

DEFENDANTS' MOTION IN LIMINE TO EXCLUDE OR LIMIT EXPERT TESTIMONY FROM VICTOR VASQUEZ AND BRENDAN HANRATTY (DKT. [ 865 ], filed on January 17, 2019)

DEFENDANTS' MOTION IN LIMINE TO EXCLUDE OR LIMIT TESTIMONY FROM JOHN FEENEY, JOHN CASTANEDO, AND JOSE URITA (DKT. [ 866 ], filed on January 17, 2019)

DEFENDANTS' MOTION IN LIMINE TO EXCLUDE THE TESTIMONY OF TYLER CALL (DKT. [ 890 ], filed on January 24, 2019)

DEFENDANTS' MOTION IN LIMINE TO EXCLUDE STATEMENTS THAT DO NOT MEET THE REQUIREMENTS OF FRE 801(D)(2)(E) (DKT. [ 868 ], filed on January 17, 2019)

DEFENDANTS' MOTION IN LIMINE TO EXCLUDE UNCONFRONTED OUT OF COURT STATEMENTS (DKT. [ 867 ], filed on January 17, 2019)

DEFENDANTS' MOTION IN LIMINE TO PRECLUDE GUILTY PLEAS AS ADMISSIBLE TO PROVE ANY CHARGE IN THIS CASE (DKT. [ 869 ], filed on January 17, 2019)

DEFENDANTS' MOTION IN LIMINE TO PROHIBIT LAW ENFORCEMENT OFFICERS FROM TESTIFYING ABOUT THE TRUTHFULNESS OF OUT OF COURT STATEMENTS (DKT. [ 870 ], filed on January 17, 2019)

DEFENDANTS' MOTION IN LIMINE TO EXCLUDE TESTIMONY AND OUT OF COURT STATEMENTS OF COOPERATING WITNESSES WHO HAVE RECEIVED PAYMENT OR OTHER CONSIDERATION (DKT. [ 871 ], filed on January 17, 2019)

DEFENDANTS' MOTION IN LIMINE FOR MEASURES TO PREVENT JURY PREJUDICE IN REGARD TO THE HANDLING OF DEFENDANTS (DKT. [ 872 ], filed on January 17, 2019)

DEFENDANTS' MOTION IN LIMINE TO EXCLUDE JAIL WRITINGS AND TESTIMONY ABOUT JAIL WRITING (DKT. [ 873 ], filed on January 17, 2019)

## I.    INTRODUCTION

In July 2013, a grand jury indicted defendants Jose Rodriguez-Landa ("Rodriguez-Landa"), Fred Anthony Montoya ("Montoya"), Luis Gerardo Vega ("Vega"), Manuel Larry Jackson ("Jackson"), and Sonia Apodaca ("Apodaca") on one count of conspiracy with each other to: (1) possess with intent to distribute at least 50 grams of methamphetamine, or at least 500 grams of a mixture of substance containing a detectable amount of methamphetamine, in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(A)(viii); (2) distribute at least 50 grams of methamphetamine, or at least 500 grams of a mixture of substance containing a detectable amount of methamphetamine, in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(A)(viii); (3) possess with intent to distribute at least 100 kilograms of a mixture or substance containing a

detectable amount of marijuana, in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(B)(vii); and (4) distribute at least 100 kilograms of a mixture or substance containing a detectable amount of marijuana, in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(B)(vii) (Count One). Dkt. 1 ("Indictment") at 6–7.[1]

The indictment also charges several defendants with discrete drug offenses, all of which are identified as overt acts in furtherance of the conspiracy alleged in Count One. Specifically, the indictment charges as follows: Count Two charges F. Montes and Vega with one count of aiding and abetting each other to knowingly and intentionally possess with intent to distribute at least 100 kilograms of marijuana on October 12, 2011, in violation of 18 U.S.C. § 2(a), 21 U.S.C. § 841(a)(1) and 21 U.S.C. § 841(b)(1)(B)(vii); Count Three charges F. Montes and another individual with aiding and abetting each other to knowingly and intentionally possess with intent to distribute at least 50 grams of methamphetamine on January 27, 2012, in violation of 18 U.S.C. § 2(a), 21 U.S.C. § 841(a)(1), and 21 U.S.C. § (b)(1)(A)(viii); Count Four charges F. Montes and another individual with knowingly and intentionally distributing at least 50 grams of methamphetamine on January 27, 2012, in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(A)(viii); Count Five charges F. Montes and Jackson with aiding and abetting each other to knowingly and intentionally possess with intent to distribute at least 500 grams of a substance containing a detectable amount of methamphetamine on January 31, 2012, in violation of 18 U.S.C. § 2(a), 21 U.S.C. § 841(a)(1), and 21 U.S.C. § (b)(1)(A)(viii); Count Six charges F. Montes, Jackson, and two others with aiding and abetting each other to knowingly and intentionally possess with intent to distribute at least 50 grams of methamphetamine on February 3, 2012, in violation of 18 U.S.C. § 2(a), 21 U.S.C. § 841(a)(1), and 21 U.S.C. § (b)(1)(A)(viii); and Count Seven charges F. Montes and another individual with knowingly and intentionally distributing at least 50 grams of methamphetamine on February 3, 2012, in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(A)(viii). The Indictment also seeks forfeiture pursuant to 21 U.S.C. § 853.

The indictment alleges that defendants Rodriguez-Landa, Moreno, Montoya, Vega, Jackson and Apodaca are members or associates of the Mexican Mafia ("La Eme"), an organization that "controls much of the distribution of drugs and other criminal activities within California state prisons, California county jails, and some federal prisons." Id. at 2. Outside of prison, the Mexican Mafia exercises control "over the criminal activities, including drug trafficking, of Hispanic street gangs throughout Southern California and elsewhere." Id. Because most Mexican Mafia members are incarcerated, members send instructions to local

---

[1] The indictment also named as defendants Jimmy Ruben Soto, Raymond Lozano, Claudia Garcia, Adam Rios, Omar Hugo Robles, Freddie Montes, Michael Moreno, and Efrain Isak Rosales. Six of these defendants have entered pleas; the seventh's case has been severed; the eighth is currently a fugitive.

street gangs and other Mexican Mafia members through telephone calls, prison system emails, letters, and "kites," which are notes smuggled by prisoners. Id. at 4. The indictment further alleges that F. Montes is a member of La Familia Michoacán drug cartel ("La Familia" or "LFM"), and its successor, Los Caballeros Templarios (the "Knights Templar" or "LCT"). Id. at 5. La Familia is based in the Mexican state of Michoacán, and is allegedly responsible for trafficking hundreds of thousands of pounds of controlled substances, including methamphetamine, into the United States. Id.

In brief, the Indictment alleges that members of La Familia and the Mexican Mafia conspired to operate "the Project," an alliance through which La Familia agreed to provide drugs and money to the Mexican Mafia and, in exchange, the Mexican Mafia agreed to (1) distribute La Familia drugs through its street gang networks, (2) collect La Familia debts, and (3) provide protection to incarcerated La Familia members. Specifically, the Indictment alleges that the conspiracy began in January 2011, when La Familia members approached then-incarcerated Rodriguez-Landa and asked him to lead the Project. Id. at 10. In February 2011, Rodriguez- Landa allegedly directed La Familia to Moreno, who would help lead the Project while Rodriguez-Landa remained incarcerated. Id. That same month, F. Montes and other La Familia members also discussed the Project with a Mexican Mafia member who, unbeknownst to defendants, was acting as a confidential informant ("CS-1"). Id. at 13.

Discussions concerning the Project continued through the first half of 2011. Much of this ongoing communication was allegedly facilitated by Apodaca. Id. at 10–20. In April 2011, Montoya, Vega, and F. Montes allegedly traveled to Michoacán to meet with leaders of La Familia about the Project. Id. at 21. Over the next several months, La Familia, operating through F. Montes, allegedly funneled both drugs and drug proceeds to Mexican Mafia members in the United States. Id. at 25–30. Beginning in September 2011 and continuing through February 2012, F. Montes allegedly furnished Vega, Jackson, and the CS-1 with marijuana and methamphetamine for distribution in connection with the Project. Id. at 31–41. Discussions concerning the Project, as well as distribution of drug proceeds generated by the Project, allegedly continued throughout 2012. Id. at 41–44.

In preparation for trial, defendants and the government have filed twenty-three motions in limine. Having carefully considered the parties' arguments, the Court finds and concludes as follows.

## II.  THE GOVERNMENT'S MOTIONS IN LIMINE TO ADMIT EVIDENCE OF DEFENDANTS' "BAD ACTS" AND PAST CONVICTIONS

On August 17, 2018, the government filed a motion in limine to admit "bad act" evidence pertaining to defendants Jose Rodriguez-Landa and Sonia Apodaca. Dkt. 784 ("MIL 1"). Also on August 17, 2018, the government filed two motions in limine to admit evidence pertaining to defendants Jackson and Montoya, pursuant to Rule 404(b). Dkts. 789 ("MIL 2"), 791 ("MIL

3"). Finally, the government moves in limine to admit, pursuant to Federal Rule of Evidence 609, some of defendants' past felony convictions for the purposes of impeachment. Dkt. 787 ("MIL 4").

## A.  Legal Standard

### i.  Federal Rule of Evidence 404(b)

Pursuant to Rule 404(b), evidence of a defendant's crimes, wrongs, or other bad acts may be admitted to prove "motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident[.]" Fed. R. Evid. 404(b). Rule 404(b) is an "inclusi[ve]" rule meaning "other acts evidence is admissible whenever relevant to an issue other than defendant's criminal propensity." United States v. Mehrmanesh, 689 F.2d 822, 830 (9th Cir. 1982). Evidence is therefore admissible under Rule 404(b) if it (1) tends to prove a material fact; (2) the other act is not too remote in time; (3) the evidence is sufficient to support a finding that the person committed the act; and (4) if admitted to prove intent or knowledge, the act is similar to that charged. United States v. Tsinnijinnie, 91 F.3d 1285, 1288-89 (9th Cir. 1996). The Ninth Circuit has not established a specific number of years after which past conduct becomes too remote. United States v. Vo, 413 F.3d 1010, 1019 (9th Cir. 2005) (citing United States v. Johnson, 132 F.3d 1279, 1283 (9th Cir. 1997)). To support a finding that the person committed the act—the third prong—a jury must be able to "reasonably conclude" that the act occurred. United States v. Bailey, 696 F.3d 794, 799 (9th Cir. 2012) (citing Huddleston v. United States, 485 U.S. 681, 685 (1988)).

When the four factors are met, the evidence should be admitted "unless its prejudicial impact substantially outweighs its probative value," pursuant to Rule 403. Johnson, 132 F.3d at 1282. "The Government, however, must carry the burden of showing how the proffered evidence is relevant to one or more issues in the case; specifically, it must articulate precisely the evidential hypothesis by which a fact of consequence may be inferred from the other acts evidence." Mehrmanesh, 689 F.2d at 830. "In admitting relevant evidence under rule 404(b), the trial court must balance the probative value of the evidence against the possibility that the jury would be prejudiced against the defendant because of his participation in other criminal conduct." United States v. Young, 573 F.2d 1137, 1140 (9th Cir. 1978) (internal citation omitted). "This determination is generally a matter of discretion for the trial court." Young, 573 F.2d at 1140 (citing United States v. Hearst, 563 F.2d 1331, 1336 (9th Cir. 1977); United States v. Rocha, 553 F.2d 615, 616 (9th Cir. 1977)). If the Court chooses to admit evidence of other bad acts, the Court should give an appropriate limiting instruction.

Specifically, with regard to drug trafficking and sales, the Ninth Circuit has "consistently held that evidence of a defendant's prior possession or sale of narcotics is relevant under Rule 404(b) to issues of intent, knowledge, motive, opportunity, and absence of mistake or accident in prosecutions for possession of, importation of, and intent to distribute narcotics." Vo, 413

F.3d at 1018 (quoting <u>Mehrmanesh</u>, 689 F.2d at 832)); <u>see also</u> <u>United States v. Lozano</u>, 623 F.3d 1055, 1059 (9th Cir. 2010) (affirming the admission of evidence of the defendant's prior possession and sale of narcotics).

### ii.    Inextricably Intertwined Evidence

While Rule 404(b) provides that certain bad act evidence is admissible when offered for the proper, material purpose, the Ninth Circuit has also cautioned that "evidence should not be considered 'other crimes' or 'other act' evidence within the meaning of Rule 404(b) if 'the evidence concerning the "other" act and the evidence concerning the crime charged are inextricably intertwined.'" <u>United States v. Dorsey</u>, 677 F.3d 944, 951 (9th Cir. 2012) (quoting <u>United States v. Soliman</u>, 813 F.2d 277, 279 (9th Cir.1987)).  The rationale is that "[t]he policies underlying rule 404(b) are inapplicable when offenses committed as part of a 'single criminal episode' become other acts simply because the defendant 'is indicted for less than all of his actions.'" <u>United States v. Williams</u>, 989 F.2d 1061, 1070 (9th Cir. 1993).

Other act evidence can be considered "inextricably intertwined" in two primary ways: "First, other act evidence may constitute[ ] a part of the transaction that serves as the basis for the criminal charge.  Second, admission of other act evidence may be necessary . . . to permit the prosecutor to offer a coherent and comprehensible story regarding the commission of the crime." <u>Dorsey</u>, 677 F.3d at 951 (internal citations and quotations omitted).  As is relevant to this case, "[t]he rule is well established that the government in a conspiracy case may submit proof on the full scope of the conspiracy; it is not limited in its proof to the overt acts alleged in the indictment." <u>United States v. Rizk</u>, 660 F.3d 1125, 1131 (9th Cir.2011).

### iii.    Federal Rule of Evidence 609

Rule 609 governs "attacking a witness's character for truthfulness by evidence of a criminal conviction." Fed. R. Evid. 609(a).  When the witness to be impeached is the criminal defendant, evidence of a conviction for a crime punishable by death or imprisonment for more than one year generally "must be admitted ... if the probative value of the evidence outweighs its prejudicial effect to that defendant." Fed. R. Evid. 609(a)(1)(B).  But where

> more than 10 years have passed since the witness's conviction or release from confinement for [the crime], whichever is later ... [e]vidence of the conviction is admissible only if:
>
> > (1) its probative value, supported by specific facts and circumstances, substantially outweighs its prejudicial effect; and
> >
> > (2) the proponent gives an adverse party reasonable written notice of the intent to use it so that the party has a fair opportunity to contest its use.

Fed. R. Evid. 609(b).  Courts in the Ninth Circuit consider five factors in balancing the probative evidence of a defendant's prior conviction against its prejudicial effect: "(1) the impeachment value of the prior crime; (2) the point in time of the conviction and the witness's subsequent history; (3) the similarity between the past crime and the charged crime; (4) the importance of defendant's testimony; and (5) the centrality of defendant's credibility." <u>United States v. Hursh</u>, 217 F.3d 761, 768 (9th Cir. 2000) (citing <u>United States v. Browne</u>, 829 F.2d 760, 762–63 (9th Cir. 1987)).  "The government bears the burden of showing, based on these factors, that the proffered evidence's probative value substantially outweighs its prejudicial effect." <u>United States v. Alexander</u>, 48 F.3d 1477, 1488 (9th Cir. 1995) (citing <u>Browne</u>, 829 F.2d at 763).  There is an exception for crimes involving dishonesty, however.  "[F]or any crime regardless of the punishment, the evidence must be admitted if the court can readily determine that establishing the elements of the crime required proving—or the witness's admitting—a dishonest act or false statement."  Fed. R. Evid. 609(a)(2).

**B.     The government's motion in limine to admit evidence pertaining to defendants Jose Rodriguez-Landa and Sonia Apodaca**

The government seeks to introduce evidence of Rodriguez-Landa's and Apodaca's prior admissions and alleged "bad acts."  MIL 1 at 1.  Specifically, the government seeks to admit evidence concerning: (1) Rodriguez-Landa's leadership of a heroin drug trafficking operation at the U.S. Penitentiary in Lee County, Virginia ("USP Lee") in 2011.  This operation was allegedly supported by La Familia representatives, and involved defendants Hugo, F. Montes, and Apodaca; (2) Rodriguez Landa's drug trafficking in California state prisons and outside of prison; (3) Apodaca's admissions which demonstrated that she "knew the Montes Brothers were drug dealers and provided drugs to persons who worked at the direction of Rodriguez-Landa"; (4) Rodriguez-Landa's admission to confidential informant CS-2 that Rodriguez-Landa trafficked methamphetamine with the Montes brothers in the 1990s; and (5) Rodriguez-Landa's statements to CS-2 that he wanted to kill CS-1, due to CS-1's involvement in the Project. <u>Id.</u> at 1–2.  The government argues that the evidence is admissible because it is "inextricably intertwined" with the instant charges, and is relevant to proving intent, knowledge, motive, and modus operandi. <u>Id</u> at 2.  In the alternative, the government also argues that this evidence against Rodriguez-Landa is admissible under Federal Rule of Evidence 404(b). <u>Id.</u> at 12.

On January 24, 2019, Jackson filed an opposition to the government's motion.  Dkt. 900 ("Opp'n 1J").  On January 25, 2019, Rodriguez-Landa and Apodaca also opposed the motion. Dkts. 921 ("Opp'n 1RL"), 912 ("Opp'n 1A").

**i.     Evidence pertaining to Rodriguez-Landa**

The government seeks to present evidence of Rodriguez-Landa's management of a drug trafficking operation at USP Lee by calling CS-2 to testify.  CS-2 shared a cell with Rodriguez-Landa while they were incarcerated at USP Lee.  The government represents that CS-2 was a

"longtime 'Sureno', a soldier for the Mexican Mafia." Id. at 3.  While housed with Rodriguez-Landa, the government states that CS-2 conducted Mexican Mafia business on behalf of Rodriguez-Landa, which included placing telephone calls to Apodaca and the Montes brothers to further the Project, and helping to run the heroin operation at USP Lee.  Id. at 7.  Some of the telephone calls that CS-2 placed are referenced as overt acts in the charged conspiracy.  See Indictment, overt acts, nos. 3, 12, 31, 34, 38, 46-52, 67-70, and 75.

The government argues that the evidence of Rodriguez-Landa's heroin operation at USP Lee is admissible because it is "inextricably intertwined" with the charged drug trafficking conspiracy in this case. "La Familia and the Montes Brothers provided assets to Rodriguez-Landa with the expectation that Rodriguez-Landa would lead the Project from Mexico upon his release from federal prison and deportation to Mexico."  MIL 1 at 11.  Accordingly, the government contends that this evidence must be offered "to permit the prosecutor to offer a coherent and comprehensible story regarding the commission of the crime." Id. (quoting United States v. Vizcarra-Martinez, 66 F.3d 1006, 1013 (9th Cir. 1995).

Similarly, the government seeks to admit evidence about Rodriguez-Landa's involvement in 2011 with drug trafficking in other prisons, outside of USP Lee, and on the street, outside of prison.  MIL 1 at 19.  The government states that CS-2 will testify that Rodriguez-Landa entrusted CS-2 to handle certain aspects of this trafficking business, including by calling individuals outside of prison to help collect money.  These calls were recorded by the United States Bureau of Prisons ("BOP"), and some of them are included in the indictment as overt acts.  Id. 19–20; see Indictment Overt Act 12.  The government argues that the evidence (1) explains the nature and relationship between Rodriguez-Landa and CS-2; (2) provides proof of Rodriguez-Landa's influence over California state prisons . . . and (3) demonstrates his knowledge of drug trafficking operations to loyalists."  MIL 1 at 19. The government moves to admit CS-2's testimony, along with the BOP recorded telephone calls.  Id.

The government also moves to admit evidence that Rodriguez-Landa trafficked drugs with the Montes brothers in the 1990's.  Rodriguez-Landa allegedly shared this information with CS-2 while they were celled together at USP Lee.  The evidence is corroborated by BOP calls between H. Montes and CS-2, as well as by recorded conversations between CS-1 and the Montes brothers.  Id. at 23.  The government alleges that "[t]his evidence will allow the government to tell the complete story of count one and/or the story of Rodriguez-Landa's criminal association with the Montes brothers."  Id. at 24.

Finally, the government moves to admit evidence that Rodriguez-Landa allegedly told CS-2 that he was upset that CS-1 had become involved with the Project, and that Rodriguez-Landa wanted to kill CS-1. Id. 24–25.  The government states that no plan to kill CS-1 was ultimately established.  Id. at 25.  Still, the government argues that this bad act is relevant to the charged conspiracy because it "demonstrates that Rodriguez-Landa desired to control the Project." Id.

In opposition to the government's motion, Rodriguez-Landa argues that this evidence should be excluded in its entirety. Rodriguez-Landa argues that his alleged conduct at USP Lee and in other prisons is not proof of his involvement in the Project. Opp'n 1RL at 5. Rodriguez-Landa argues that the fact that the government did not indict him on these other acts indicates that they should be excluded from evidence. Id. Rodriguez-Landa also questions the reliability of the evidence, and stresses its prejudicial effect. "The possibility that this conversation as reported by CS-2 is made up from whole cloth is great. It should be excluded as unreliable and uncorroborated and thus unfairly prejudicial." Id. at 11. Rodriguez-Landa also raises concern that CS-2's testimony appears, at times, to constitute impermissible hearsay—particularly when CS-2 recounts conversations with individuals who are not charged in this case. Id. at 10.

The Court rules that evidence of Rodriguez-Landa's involvement in drug trafficking at USP Lee, in other prisons, and on the streets, as well as his previous involvement with the Montes brothers, may be admitted into evidence. "[T]he prosecution is not restricted to proving in a vacuum the offense," and "the jury cannot be expected to make its decision in a void— without knowledge of the time, place, and circumstances of the acts which form the basis of the charge." Vizcarra-Martinez, 66 F.3d at 1013 (quoting United States v. Daly, 974 F.2d 1215, 1216 (9th Cir.1992)). Here, the evidence of Rodriguez-Landa's alleged involvement in prior drug trafficking allows the prosecutors to tell a complete story. The evidence is relevant to the formation and operational mechanics of the alleged conspiracy, and it is at times referenced in the complaint. Accordingly, it constitutes "inextricably intertwined" evidence. The evidence is also probative in that it shows Rodriguez-Landa's development of relationships with other members of the charged conspiracy, like the Montes brothers, and it allegedly illustrates how Rodriguez-Landa was positioned to operate the charged conspiracy. See United States v. Jones, 982 F.2d 380, 382–83 (9th Cir. 1992), as amended (Apr. 6, 1993) (admitting prior acts because they "explain the nature of the relationship" between co-conspirators while placing "their transaction in context for the jury," thereby "show[ing] the background and development of the conspiracy."). Although defendants raise concerns regarding the credibly of CS-2, a convicted felon who is testifying pursuant to a plea agreement, opp'n 1RL at 9, the government responds that the fact that the government offers recorded BOP telephone calls demonstrates that the evidence is reliable. MIL 1 at 14. Credibility concerns may also be addressed on cross-examination.

Given the probative value of this evidence, the Court thus finds that offering of this evidence at trial would not unfairly prejudice Rodriguez-Landa, pursuant to Rule 403. See Williams, 989 F.2d at 1070 (affirming admission of testimony regarding defendant's prior drug transactions "that fell outside the charged conspiracy" to distribute drugs and noting that any unfair prejudice was cured by "[t]he court issu[ing] a cautionary instruction that the jury could not consider the testimony as evidence of [defendant's] character to engage in drug dealing."). While the Court provisionally permits the government to offer this evidence, the government

must lay an adequate foundation for receipt of the evidence. CS-2's testimony will be subject to the rules of evidence.

However, the government may not admit evidence pertaining to Rodriguez-Landa's purported conversations in which he expressed a desire to kill CS-1. The Court finds this evidence of minimal relevance to the charged offense, and the likelihood that it would cause unfair and unwarranted prejudice is high. The Court hereby excludes it under Rule 403.

### ii.    Evidence pertaining to Apodaca

The government also seeks to admit evidence that, during calls on March 4 and 8, 2012, Apodaca told Arnulfo Rodriguez-Zuniga, an inmate at USP Lee whom the government calls an "unindicted co-conspirator," that she knew the Montes brothers trafficked drugs. MIL 1 at 21. These conversations were captured on BOP recorded calls. See MIL 1, Exs. 15, 16. Per the government, Apodaca allegedly told Rodriguez-Zuniga that the Montes brothers wanted Apodaca to collect proceeds from drug sales from a woman who worked for Rodriguez-Landa. MIL 1 at 21–22. Apodaca refused to do so. Id. The government calls these telephone calls "evidence of the Project in action, namely, drugs from La Familia to the Mexican Mafia." Id. at 22. It also argues that the evidence constitutes admissions by Apodaca, a party opponent, which render the statements admissible under Federal Rule of Evidence 801(d)(2)(A). Id. at 23.

In opposition to the government's motion, Apodaca argues that the evidence is irrelevant, prejudicial, and accordingly inadmissible. Opp'n 1A at 2. She argues that, "[c]ontrary to the Government's characterization of these calls, these recordings do not indicate that Ms. Apodaca had knowledge of any drug trafficking or drug conspiracy. . . . In fact, in these calls, [Apodaca] made it clear that the subject matter being discussed was a matter that did not pertain to her, and she did not want to get involved." Id. at 3.

The evidence about Apodaca's alleged familiarity with the Montes brothers may be offered at trial. Apodaca's statements constitute party admissions, which are admissible under 801(d)(2)(A). The Court finds these admissions to be relevant to the relationships between the individuals in the charged conspiracy, as well as to Apodaca's knowledge of the alleged offenses. Jones, 982 F.2d at 382–83. This evidence has probative value, which is not outweighed by any unfairly prejudicial effect. Apodaca contests the government's interpretation of her telephone calls with Rodriguez-Zuniga, and the Court acknowledges that Apodaca refused to collect proceeds. Accordingly, it appears that a limiting instruction should be given to specify that this evidence pertains only to Apodaca's knowledge—not culpability.

Accordingly, the government's motion in limine to admit evidence pertaining to Rodriguez-Landa and Apodaca is **GRANTED** in part and **DENIED** in part.

### iii.  Jackson's Request to Sever his Case in the Event Prior Bad Acts Evidence is Admitted Against Rodriguez-Landa and Apodaca

On January 24, 2019, Jackson also filed an opposition to the government's motion to offer this evidence against Rodriguez-Landa and Apodaca. Dkt. 900 ("Opp'n 1J"). Jackson argues that this evidence is highly prejudicial, which creates a risk that jurors will make impermissible character inferences about Rodriguez-Landa and Apodaca, which will extend to Jackson. Id. at 2. Accordingly, Jackson moves to sever his case from Rodriguez-Landa and Apodaca. Id. at 3. Citing Zaifro v. United States, 506 U.S. 534 (1993), Jackson argues that here, where defendants have "markedly different degrees of culpability" and "are tried together in a complex case," risk of prejudice is high, and severance is appropriate. Id. at 5. He cites sociology studies that indicate that limiting instructions cannot cure the prejudice this evidence may produce. Id. at 8.

Under Federal Rule of Criminal Procedure 14(a), "if the joinder of offenses or defendants in an indictment, an information, or a consolidation for trial appears to prejudice a defendant or the government, the court may order separate trials of counts, sever the defendants' trials, or provide any other relief that justice requires." Fed. R. Crim. P. 14(a). The decision whether to sever properly joined defendants under Rule 14 is "committed to the sound discretion of the trial court." United States v. Adams, 581 F.2d 193, 197 (9th Cir. 1978). The Supreme Court has cautioned that "a district court should grant a severance under Rule 14 only if there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence." Zafiro, 506 U.S. at 539. The Supreme Court adds that, even where a court finds likelihood of prejudice by trying a case jointly, "less drastic measures, such as limiting instructions, often will suffice to cure any risk of prejudice," as opposed to severance. Id. at 539.

The Court declines to sever Jackson's case. This is not an instance in which defendants offer conflicting, incompatible defenses. Here, the government offers evidence, which Jackson argues should not be introduced against him. Jackson's argument amounts to the generic proposition that a jury cannot compartmentalize evidence. But courts regularly hold that prejudice from a refusal "to sever counts can be cured by proper jury instructions, and juries are generally presumed to follow their instructions." United States v. Hickerson, 489 F.3d 742, 746 (5th Cir. 2007). Moreover, "it is well settled that defendants are not entitled to severance merely because they may have a better chance of acquittal in separate trials," Zafiro, 506 U.S. at 540, and Jackson has not shown that a failure to sever will result in clear, manifest, or undue prejudice, so as to deny him a fair trial, United States v. Felix–Gutierrez, 940 F.2d 1200, 1209 (9th Cir. 1991).

For the foregoing reasons, Jackson's request to sever his case is **DENIED**.

**C.    The government's motion in limine to admit evidence pertaining to defendant Manuel Larry Jackson**

The government moves to admit evidence of Jackson's alleged prior conversations about transacting drugs with a confidential informant, along with a subsequent meeting that occurred. MIL 2 at 2. This evidence specifically concerns (1) a September 20, 2011 phone call, wherein defendant Jackson told a confidential informant that he was receiving a supply of drugs; (2) a September 22, 2011 phone call in which Jackson told the confidential informant that he was sending someone to meet with the confidential informant to discuss drug transactions, on Jackson's behalf; and (3) a meeting on September 22, 2011, when Jackson sent someone to meet with the confidential informant. Id. at 1–2. The phone calls and the meeting were recorded by the confidential informant, and the government has produced draft transcripts of the recordings. Id. at 7; see Exs. 2, 3. The events were monitored in connection with the government's investigation into the "Big Hazard" criminal organization, which led to a separate criminal indictment. See United States v. Manuel Larry Jackson, et. al., CR-14-684-CAS. In that case, defendant Jackson is charged, *inter alia*, in a RICO conspiracy and a drug conspiracy. Id. In the present case, the government argues that this evidence should be admitted because the four Tsinnijinnie factors are met: the evidence is material to Jackson's "intent, knowledge, plan, and preparation in this case," id. at 5, it occurred in 2011, at a time similar to the overt acts in this case, id. at 6, the evidence is reliable because it was captured on audio recordings, id. at 7, and the other bad acts are similar to the conspiracy charged in this case, id. at 8. The government adds that the evidence is not unduly prejudicial, particularly given its strong probative effect. Id. at 9.

On January 24, 2019, Jackson filed an opposition to the government's motion to admit this evidence. Dkt. 899 ("Opp'n 2"). Jackson argues that "the evidence that the government seeks to offer is nothing more than impermissible character evidence of Mr. Jackson's criminal propensity to involve himself in drug dealing." Opp'n 2 at 2. Jackson emphasizes that "the government's pleading never states what disputed issue of fact this other crimes evidence tends to prove or how the evidence proves such disputed fact." Id. He also points to the dissimilarity between the drug conspiracy charged in this case, as compared to the drug conspiracy charged in the other indictment, and Jackson stresses that no drugs or money were produced or seized following the alleged telephone calls and meeting. Id. Jackson further argues that, depending on how the government offers this evidence, it would constitute impermissible hearsay, and would violate the Confrontation Clause. Id. Finally, at oral argument, Jackson also contended that the evidence would cause the jury to speculate as to whether or not Jackson was charged for the other conduct, which would unfairly prejudice him.

The Court finds that the government may offer this evidence. The Ninth Circuit has recognized that evidence of past drug sales or prior drug possession can be "relevant under Rule 404(b) to issues of intent, knowledge, motive, opportunity, and absence of mistake or accident

in prosecutions for possession of, importation of, and intent to distribute narcotics." Vo, 413 F.3d at 1018. At oral argument, the government clarified that this evidence would be particularly probative for showing Jackson's network and his means to distribute controlled substances. The government also emphasized that because these conversations occurred only one month before Jackson allegedly joined the Project, their relevance was heightened. Accordingly, the first and second Rule 404(b) factors—materiality and timeliness—are met. Given the audio recordings of these conversations, the Court finds that the evidence is sufficient to support a finding that they occurred, and these conversations are similar to the charged offense.

In offering this evidence, the government must be clear that it has neither demonstrated that a drug sale occurred, nor that Jackson possessed drugs. The government must also avoid offering the evidence in a manner that would apprise the jury of any other charges pending against Jackson. The parties should meet and confer and propose to the Court an appropriate limiting instruction which will address this concern. Accordingly, the government's motion is **GRANTED**.

D.     **The government's motion in limine to admit into evidence defendant Montoya's 2001 felony drug convictions under Federal Rule of Evidence 404(b)**

On December 6, 2001, Montoya was convicted of (1) possession of ephedrine with intent to manufacture methamphetamine, in violation of California Health & Safety Code § 11383(c)(1) and (2) manufacture of a controlled substance, namely methamphetamine, in violation of California Health & Safety Code § 11379.6(a). MIL 3 at 1. Pursuant to Rule 404(b), the government seeks to admit these two felony drug convictions into evidence. The government argues that these convictions are relevant to proving the material issues of knowledge, absence of mistake, and lack of accident in current case. Id. at 3 (citing United States v. Howell, 231 F.3d 615, 628 (9th Cir. 2000)). The government adds that "Montoya's prior methamphetamine convictions are particularly relevant because they involved manufacture of methamphetamine, thus highlighting that defendant Montoya had particular knowledge of and experience with methamphetamine"—the drug allegedly sold by the Project. Id. at 5. The government also argues that the other Tsinnijinnie factors are met: the prior convictions are similar to the crime charged, id. at 5, the convictions, which were ten-years-old when the Project began, are not too remote in time, id at 6. The government concludes that Rule 403 should not preclude this evidence because, while potentially prejudicial, it is not unfairly so. Id. at 6.[2]

---

[2]     In arguing that the admission of these past convictions would not unfairly prejudice Montoya, the government's opposition brief stated that, "[t]here is nothing about defendant's prior conduct that will so incite the jury that it cannot render a decision based on the evidence.

On January 28, 2019, Montoya filed an opposition.  Dkt. 927 ("Opp'n 3").  Montoya argues that these past convictions are inadmissible under Rule 404(b).  Montoya states that he "does not intend to assert 'mistake' or 'lack of knowledge' as a defense," and accordingly this evidence is not probative of a material issue.  Opp'n 3 at 6.  Montoya characterizes the prior conviction as markedly dissimilar to the present charge, and he argues that that the prior convictions are "extremely remote in time."  Id.  Given the limited probative value of the convictions, Montoya argues that to admit them would be unduly prejudicial, which requires their exclusion under Rule 403.

The Court **RESERVES** ruling on this motion until the record better illustrates the other evidence the government will offer against Montoya.  The Court recognizes that this evidence is material in as much as it relates to Montoya's knowledge of manufacturing methamphetamine.  See Vo, 413 F.3d at 1018.   However, the Court is disinclined to permit the government to offer these eighteen-year old prior convictions if the audio recordings which the government will offer, in and of themselves, illustrate Montoya's knowledge, as well.

### E.    The government's motion in limine to admit evidence of defendants' prior convictions, pursuant to Federal Rule of Evidence 609

In the event defendants Montoya, Vega, Jackson and Rodriguez-Landa testify at trial, the government moves in limine to admit a number of their past felony convictions for the purposes of impeachment, pursuant to Federal Rule of Evidence 609.  MIL 4.  Jackson and Vega filed oppositions on January 24, 2018.  Dkts. 898 ("Opp'n 4J"), 905 ("Opp'n 4V").  Montoya filed an opposition on January 28, 2019.  Opp'n 3.[3]

#### i.    Admission of Montoya's Prior Convictions

If Montoya testifies, the government seeks to impeach him with (1) 2001 felony convictions of California Health & Safety Code Section 11352(c)(1), Possession of Ephedrine with Intent to Manufacture Methamphetamine, and California Health & Safety Code Section 11379.6(A), Manufacture Controlled Substance, for which Montoya received a six-year term of imprisonment; (2) a 2009 felony conviction of California Vehicle Code Section 10851(a), the taking of a vehicle without the owner's consent, for which Montoya received a two-year term of

_The prior conviction, like the instant offense, involved the unlawful possession of a firearm._" MIL 3 at 7 (emphasis added).  At oral argument, the government clarified that its reference to a firearm was a typographical error.  The government does not seek to offer into evidence a conviction for the unlawful possession of a firearm, and it also does not allege that Montoya unlawfully possessed a firearm in the charged offense.

[3]      Montoya filed a single opposition in response to the government's motions in limine to (1) admit Montoya's prior drug convictions under Federal Rule of Evidence 404(b), dkt. 791, and (2) to admit Montoya's past convictions for impeachment, dkt. 787.  See Opp'n 3.

imprisonment; and (3) a 2009 felony conviction of California Vehicle Code Section 2800.2(a), Evading a Peace Officer/Disregard Safety, for which Montoya received a two-year term of imprisonment.

Montoya opposes the admissibility of these past convictions.  Opp'n 3 at 2.  He argues that three of the four convictions are not crimes of moral turpitude, and Montoya contends that if he were to take the stand, "he would not misrepresent his background"—rendering the admission of these crimes irrelevant.  Id. at 4.  With regard to California Vehicle Code Section 10851(a), taking of a vehicle without the owner's consent, Montoya argues that the government has not carried its burden of proof showing that the theft was committed in a way involving fraud or deceit, nor that the probative value of admitting this crime substantially outweighs the risk of prejudice to Montoya.  Id.

With regard to Montoya's 2001 convictions for drug offenses, approximately eighteen years have passed since Montoya's conviction and approximately eleven years have passed since his release for those convictions.  Under Rule 609(b), the government must therefore show that the probative value of the evidence "substantially outweighs" its prejudicial effect.  With regard to the first Hursh factor, the Ninth Circuit has held that "prior convictions for drug offenses are probative of veracity." United States v. Cordoba, 104 F.3d 225, 229 (9th Cir. 1997), as amended (Feb. 11, 1997).  Still, without record evidence that Montoya "intend[s] to misrepresent his character or to testify falsely as to his prior criminal record . . . the impeachment value of" of these offenses appears "quite low." United States v. Bagley, 772 F.2d 482, 488 (9th Cir. 1985).

The second and third factors also weigh heavily against admission of the prior conviction. More than ten years have passed since Montoya was convicted and served time for these offenses, and the government has not pointed to any "subsequent history," aside from the presently charged crimes, that would lessen the staleness of this evidence.  Importantly, too, the Advisory Committee Notes to Rule 609(b) state that "[i]t is intended that convictions over 10 years old will be admitted very rarely and only in exceptional circumstances." Fed. R. Evid. 609 advisory committee's note to 1974 enactment.  The Court also finds that the similarity between the past convictions and the presently charged offense further weighs against admission.  "Where, as here, the prior conviction is sufficiently similar to the crime charged, there is a substantial risk that all exculpatory evidence will be overwhelmed by a jury's fixation on the human tendency to draw a conclusion which is impermissible in law: because he did it before, he must have done it again." Bagley, 772 F.2d at 488.

The government argues that the fourth and fifth factors favor admission because, "if defendants testify they can be expected to attempt to explain away the government's evidence against them.  The persuasiveness of defendants' testimony before the jury will hinge in part on their credibility."  MIL 3 at 9.  However, the Court finds that the fourth and fifth factors are difficult to analyze in the pretrial context, particularly where Montoya avers that he will not

attempt to misrepresent his background.  Additionally, with regard to the importance of Montoya's testimony and credibility, the Court notes that this is not a case where the only evidence before the jury will be the conflicting narratives of a small number of witnesses.  To the contrary, the government plans to present audio recordings, law enforcement eyewitness accounts, and expert testimony.  On balance, the Court therefore finds that the government has not met its burden of showing that evidence of Montoya's 2001 drug offense convictions is sufficiently probative of his veracity to outweigh the significant risk of unfair prejudice to Montoya. [4]

Similarly, the Court finds that Montoya's 2009 conviction of California Vehicle Code Section 2800.2, evading a peace officer/disregard for safety, for which Montoya received a sentence of two-years imprisonment, should be excluded.  The Ninth Circuit has held that this offense is not categorically a crime of moral turpitude, Ramirez-Contreras v. Sessions, 858 F.3d 1298, 1307 (9th Cir. 2017), and the government has made no showing that this offense is particularly probative of Montoya's veracity and credibility.  In the absence of evidence that Montoya intends to misrepresent his background, the Court thus finds that the impeachment value of this past conviction is low.  The government is correct that this past offense bears little similarity to the present charges, which militates in favor of admissibility, but the conviction is still ten years old, and it appears that Montoya completed serving this sentence eight years ago.  Moreover, as discussed above, at this pretrial juncture, the Court cannot readily anticipate the importance of Montoya's testimony and the centrality of his credibility.  However, given the nature of the other evidence in this case, the Court believes it will be limited.  Accordingly, the Court finds that the government has not met its burden of proving that the probative value of Montoya's 2009 conviction for Section 2800.2 outweighs its prejudicial effect under Rule 609(a)(1)(B).  However, should Montoya's testimony and credibility become more central at trial, or to the extent that the government seeks to impeach Montoya by specific contradiction, the Court **RESERVES** judgment on the admissibility of Montoya's drug offenses and his Section 2800.1 offenses until trial.

With regard to Montoya's 2009 conviction for California Vehicle Code Section 10851(a), the taking of a vehicle without the owner's consent, for which Montoya received a two-year sentence, the Court finds the conviction admissible under 609(a)(1)(B).  This theft offense is less than ten years old, and the Court finds it highly probative of Montoya's veracity.  United States v. Foster, 227 F.3d 1096, 1100 (9th Cir. 2000) ("Shoplifting, burglary, grand theft and

---

[4]      These 2001 convictions for drug offenses are the same convictions that the government seeks to introduce against Montoya under Federal Rule of Evidence 404(b).  See Section II(D).  The Court reserves ruling on the admissibility of these convictions under Rule 404(b), depending on the other evidence offered by the government in its case in chief.  In the event that the Court admits these convictions under Rule 404(b), they would also become admissible for impeachment purposes.

bank robbery are all affirmative acts taken by defendants, requiring an intention to deprive one or more persons of their rightful property."); but see Almanza-Arenas v. Lynch, 815 F.3d 469, 482 (9th Cir. 2016) (ruling that Section 10851(a) is not a crime of moral turpitude under the Immigration and Nationality Act).  Although Montoya completed his sentence eight years ago, this past conviction is markedly distinct from the charged offense, which favors its admission. Moreover, while the fourth and fifth prongs may not lean toward admissibility, they are outweighed by the other factors.

### ii.     Admission of Vega's Prior Convictions

If Vega testifies, the government seeks to impeach him with (1) a 2001 felony conviction of California Penal Code Section 211, Robbery, for which Vega received a 36-month term of probation, which Vega violated in August 2004, resulting in a seven-year term of imprisonment; and (2) a 2004 conviction of California Penal Code Section 245(a)(2), Assault with a Firearm on a Person, for which Vega received a five-year term of imprisonment. MIL 4 at 2.  Vega objects to the admission of these convictions.  Opp'n 4V at 2.  He argues that the crimes are extremely aged, and that neither offense requires a finding of a dishonest act or false statement.  Id.

Here, eighteen years have passed since Vega was convicted of California Penal Code Section 211, robbery, but because he violated his parole and subsequently received a seven-year term of imprisonment, his sentence appears to have ended in 2011, eight years ago. Accordingly, the government must show that the probative value of this conviction outweighs the prejudicial effect.  Fed. R. Evid. 609(a)(1)(B).  Here, the Court finds that the government has carried its burden. "Prior convictions for robbery are probative of veracity." United States v. Alexander, 48 F.3d 1477, 1488 (9th Cir. 1995), as amended on denial of reh'g (Apr. 11, 1995) (quoting United States v. Givens, 767 F.2d 574, 580 (9th Cir.1985)).  The crime bears no resemblance to the charged offenses, which limits concerns that the jury will impermissibly speculate about Vega's propensity to act in accordance with the charged offense.  Although the Court remains uncertain of the importance of Vega's testimony or the centrality of his credibility, on balance, the Court finds that the probative value of this offense outweighs its prejudicial effect.

However, the Court finds that the government may not introduce into evidence Vega's 2004 conviction of California Penal Code Section 245(a)(2), Assault with a Firearm on a Person, for which Vega received a five-year term of imprisonment.  The Court acknowledges that the Ninth Circuit has affirmed admission of a prior conviction for "assault with a deadly weapon," implying that such a conviction may have some relevance to a witness's credibility.  See United States v. Givens, 767 F.2d 574, 579–80 (9th Cir. 1985); see also United States v. Swint, No. CR 12–08080, 2012 WL 3962704, at *1 (D. Ariz. Sept.11, 2012) (admitting evidence of prior assault conviction), aff'd, 566 F. App'x 618 (9th Cir. 2014). Still, the Court finds that a conviction for assault—which requires no deceit or untruthfulness—

is not highly probative of Vega's credibility.  <u>See</u> <u>United States v. Castor</u>, 937 F.2d 293, 298 (7th Cir. 1991) (recognizing the "limited impeachment value" of a prior battery conviction "unrelated to truthfulness"); <u>United States v. Hayes</u>, 553 F.2d 824, 827 (2d Cir.1977) (stating that "crimes of force, such as armed robbery or assault" do not "bear directly on the likelihood that the defendant will testify truthfully"); <u>Gordon v. United States</u>, 383 F.2d 936, 940 (D.C. Cir. 1967) ("Acts of violence . . . which may result from a short temper, a combative nature, extreme provocation, or other causes, generally have little or no direct bearing on honesty and veracity."); 4 Jack B. Weinstein & Margaret A. Berger, <u>Weinstein's Federal Evidence</u>, § 609.23 (2d ed. 2008) ("A 'rule of thumb' thus should be that convictions which rest on dishonest conduct relate to credibility whereas those of violent assaultive crimes generally do not."). Accordingly, the first relevant factor suggests that the probative value of Vega's 2004 conviction is low.

While Vega's assault conviction differs from the charged offense, the other factors do not favor admission.  The offense is over ten years old.  In addition, Court has already explained why it doubts the importance of Vega's testimony and the centrality of his credibility. Accordingly, the Court finds that the probative value does not substantially outweigh the prejudicial effect of this conviction, which renders it inadmissible under Rule 609(b).  As with Montoya, however, should Vega's testimony and credibility become more central at trial, or to the extent that the government seeks to impeach Vega by specific contradiction, the Court **RESERVES** judgment on the admissibility of this offense until trial.

### iii.    Admission of Jackson's Prior Convictions

If Jackson testifies at trial, the government intends to impeach him with a 2005 felony conviction of Title 18, United States Code, Section 1959, Violent Crimes in Aid of Racketeering, for which Jackson received a ninety-six-month term of imprisonment.  Jackson opposes admission of this past conviction.  Opp'n 4J at 1.  He argues that this crime of violence has "little, if nothing, to do with his truthfulness.  And, the violent and gang-related nature of the conviction will cause him extreme prejudice if it were admitted in this non-violent drug case."  <u>Id.</u> at 1–2.

For the same reasons that the Court declines to permit the government to impeach Vega with his prior conviction for a crime of violence, the Court also hereby excludes Jackson's past conviction of Title 18, United States Code, Section 1959, Violent Crimes in Aid of Racketeering.  Although Jackson's prior conviction is less aged than Vega's conviction—six years have passed since Jackson completed his sentence—the Court still finds that the prejudicial effect of this crime of violence would outweigh any probative value.  This calls for exclusion under Rule 609(a)(1)(b).  However, as with the other defendants, if Jackson testifies at trial, and if his testimony and credibility become more central, or if the government seeks to impeach Jackson by specific contradiction, the Court **RESERVES** judgment on the admissibility of this offense until trial.

#### iv.    Admission of Rodriguez-Landa's Prior Convictions

If Rodriguez- Landa testifies at trial, the government seeks to impeach him with two 1998 felony convictions of California Health & Safety Code Section 11352(a), Transportation/Sale of Controlled Substance, and California Health & Safety Code Section 11351, Possession/Purchase for Sale of Controlled Substance, for which Rodriguez-Landa received a 14-year term of imprisonment.  Rodriguez-Landa has not opposed the government's motion.  The government's motion is hereby **GRANTED**.

In accordance with the foregoing, the government's motion is **GRANTED** in part and **DENIED** in part.

## III.   THE GOVERNMENT'S MOTIONS IN LIMINE TO EXCLUDE CERTAIN EVIDENCE OFFERED BY THE DEFENDANTS

### A.    [UNDER SEAL] The government's motion in limine to preclude calling CS-1 for the primary purpose of impeaching him

On August 17, 2018, the government filed a motion in limine to preclude defendants from calling the government's confidential informant CS-1 to testify for the primary purpose of impeaching him.  Dkt. 786 ("MIL 5").  CS-1 is the main confidential informant in this case.  He agreed to cooperate with the law enforcement and serve as an informant in this case as part of a plea agreement for 2009 extortion charges.  Throughout discovery, the government provided defendants with hundreds of pages of documents, official records, police reports, transcribed interviews, and transcripts, which detail CS-1's criminal history and provide considerable amounts of impeachment and bad act evidence.  See id. at 2–3 (listing the discovery produced).  This evidence includes CS-1's rap sheet along with allegations, recounted in interviews with dozens of other confidential informants, about numerous unproven and/or uncharged criminal acts allegedly committed by CS-1.  Id.  The government contends that CS-1 will not be testifying for the government.  Id. at 1.  In addition, his statements on the audio recordings that the government intends to offer into evidence will only be offered to provide context for statements made by defendants and co-conspirators—not for their truth.  See Section IV (B).  The government requests a ruling that precludes the defense from calling CS-1 for the primary purpose of impeaching him.  MIL 5 at 3.  It also seeks to preclude the defense from impeaching government witnesses by using CS-1's criminal history and instances of "bad acts."  Id.

On January 24, 2019, Jackson filed an opposition to the government's motion.  Dkt. 902 ("Opp'n 5J").  On January 28, 2019, Rodriguez-Landa also filed an opposition, dkt. 930 ("Opp'n 5RL"), and Apodaca filed an opposition on January 30, 2019, dkt. 938 ("Opp'n 5A).  Defendants state that they do not intend to call CS-1 solely to impeach him.  Instead, defendants explain that they "seek to call this informant as a percipient witness of every aspect of this case."  Opp'n 5A  at 3.  They specify that they seek to elicit testimony on whether the

government coerced CS-1 to act as a confidential informant in this case, opp'n 5J at 3, and that they seek to inquire into the completeness of the audio recordings, opp'n 5RL at 4. "Defendant[s] should be able to inform the jury that the audio recordings at issue were the subject of selective recording and thus may not adequately reflect the entire conversation." Id.

The Court hereby **DENIES** this motion without prejudice. The Court acknowledges that while Rule 607 permits a party to impeach its own witness, Fed. R. Evid. 607, "[i]mpeachment is improper when employed as a guise to present substantive evidence to the jury that would be otherwise inadmissible." United States v. Gilbert, 57 F.3d 709, 711 (9th Cir. 1995) (internal citations omitted). Accordingly, "[a] determination must be made as to whether [a party is] examinp[ing] the witness for the primary purpose of placing before the jury substantive evidence which is otherwise inadmissible." Id. Here, defendants identify multiple reasons that they may call CS-1 to testify. The Court therefore **RESERVES** to the time of trial ruling on whether the defendants' primary purpose for calling CS-1—if they call CS-1—is a permissible purpose.

The Court also **DENIES** without prejudice the government's request to preclude defendants' use of CS-1's criminal history as impeachment evidence against law enforcement agents who testify. As presently before the Court, the Court finds the motion vague and premature. The Court cannot anticipate how law enforcement agents will testify, and accordingly, the Court cannot assess what evidence may be properly offered by the defense for the purposes of impeachment. As with all impeachment, however, Federal Rules of Evidence 608 and 609 will govern.

### B.    [UNDER SEAL] The government's motion in limine to preclude improper impeachment of the government's cooperating witnesses

On August 17, 2019, the government also moved to preclude improper impeachment of its cooperating witnesses, CS-1 and CS-2.[5] Dkt. 785 ("MIL 6") at 2. As previously mentioned, in discovery the government produced hundreds of pages of materials pertaining to CS-1's criminal background, which included details about his past convictions and allegations of uncharged crimes. See Section III(A). CS-2, a former member of the Mexican Mafia, also has a criminal history. Id. at 5, 16–17. The government moves to exclude the following evidence: (1) any adult misdemeanor convictions that did not involve dishonesty or false statements; (2) the underlying details of any convictions which do not relate to truthfulness; (3) any arrests prior that did not result in conviction, except for the fact of CS-1's arrest on extortion charges in November 2009 and of his DUI charges in May 2011; (4) any specific instances of misconduct

---

[5]      Although the government argues that defendants should be precluded from calling CS-1 because defendants intend to call him solely to impeach him, the government explains that, "out of an abundance of caution," the government also files a motion to preclude the improper impeachment of him. MIL 6 at 2.

alleged by nearly four dozen informants against CS-1, which have not resulted in conviction or are not relevant to truthfulness; (5) CS-1's psychological evaluation; (6) the tattoo of CS-2 that reads "f&\*k a bi&\*h" [sic]; (7) any reference that CS-1 consorted with prostitutes or was accused of sexual assault/battery or rape, as indicated in his psychological evaluation; (8) CS-1's adult felony convictions from 1990 and 1993; (9) CS-2's 1998 conviction of false imprisonment, in violation of California Penal Code Sections 236, 247, and his 2006 conviction of possession of a firearm by a felon, in violation of California Penal Code Section 12021(a)(1); and (10) the introduction of inflammatory language spoken by the confidential informants, which is captured in the audio recordings. Id. at 2–3, 16. The government also seeks a ruling that the defense cannot seek to impeach any government witness, including the case agents, by using CS-1's criminal history or any instances of his uncharged or unproven "bad acts." Id. at 2.

Defendants filed opposition briefs on January 24, 2019, dkt. 903 ("Opp'n 6J"), and January 30, 2019, dkt. 935 ("Opp'n 6A"). Defendants do not contest specific evidence that the government seeks to exclude, but instead, broadly assert their right to cross-examine the government's confidential informants regarding the existence and scope of a cooperation agreement. Opp'n 6J at 3. They contend that the past crimes and bad acts are relevant to informing the jury of the nature of the cooperation agreement, and the credibility of the witnesses. Opp'n 6A at 6. "Given the importance that informants, particularly CS-1, played in this investigation, the defense should not be limited in its scope of examination as to any witness." Id. Defendants add, however, that they have no intent to cross-examine witnesses about racial and sexual basis, nor about any past sexual violence. Opp'n 6J at 5.

The Court **DENIES** this motion without prejudice because it finds the motion to be premature. Impeachment of a witness is governed by Federal Rules of Evidence 608 and 609. United States v. Colbert, 116 F.3d 395, 396 (9th Cir. 1997) ("Federal Rules of Evidence 608 and 609 limit a defendant's ability to impeach an adverse witness with his prior criminal record during cross-examination."). Admissibility of impeachment evidence depends on context. United States v. Bonanno, 852 F.2d 434, 439 (9th Cir. 1988) (citing United States v. Feldman, 788 F.2d 544, 554 (9th Cir.1986)) ("A defendant's constitutional right to confront witnesses through cross-examination is limited to issues relevant to the trial."). Here, absent a specific evidentiary issue, raised in the context of trial, the Court cannot rule on the government's requests to preclude evidence. The Court cannot anticipate how the government's confidential informants will testify, or, as in the case of CS-1, if they will testify. The Court accordingly cannot now rule what impeachment evidence would or would not be relevant and admissible under Rules 608(b) or Rule 609 of the Federal Rules of Evidence. The Court emphasizes, however, that the rules of impeachment apply no differently to confidential informants than to other witnesses.

**C.      The government's motion in limine to preclude questioning on matters subject to law enforcement sensitive qualified evidentiary privilege**

On August 17, 2018, the government also moved to preclude questioning by the defense on matters protected by the "law enforcement sensitive qualified evidentiary privilege." Dkt. 788 ("MIL 7"). The government specifically argues that this privilege would preclude questioning on: (1) the legality of the collection of the recordings; (2) technical specifications of audio and video recording devices, including methods of installation, concealment and location of devices; and (3) the training of government witnesses that would reveal sensitive government programs or sources and methods. The government explains that other circuits have recognized this law enforcement sensitive qualified evidentiary privilege. See, e.g., Commonwealth of Puerto Rico v. United States, 490 F.3d 50 (1st Cir. 2007); In re City of New York, 607 F.3d 923 (2nd Cir. 2010). The government argues that the privilege stems from the principle established in Roviaro v. United States, 353 U.S. 53 (1957), that, at times, "the public interest in nondisclosure significantly outweighs the defendants' need for the information." MIL 7 at 2, 7. The government further contends that defendants' "ability to test the government's evidence will not be impaired" if the Court precludes the defense from eliciting testimony on these topics. Id. at 11.

Apocada filed an opposition on January 25, 2019. Dkt. 913 ("Opp'n 7"). Montoya joined in the motion. Dkt. 929. Defendants call this motion premature. They explain that defense counsel is currently analyzing some of these recordings, and state that there "appears to be at least a dispute as to the contents of these recordings." Opp'n 7 at 4. Defendants request that the Court reserve ruling on this motion until defense counsel obtains more information about these recordings, which will inform the topics about which they will elicit testimony at trial. Id. at 4.

Neither the Ninth Circuit nor the Supreme Court have recognized a law enforcement privilege. Shah v. Dep't of Justice, 714 F. App'x 657, 659 n.1 (9th Cir. 2017) (unpublished) (noting that neither the Ninth Circuit nor the Supreme Court have yet "recognize[d] nor rejecte[d] a 'law enforcement privilege'"). The Court declines to recognize it here. However, to the extent that defendants seek to elicit testimony about the audio recordings and the procedures that produced them, the questioning must, of course, be relevant to and probative of the integrity and veracity of the recordings. Needless questioning about government protocols and programs will be excluded.

The government's motion is **DENIED** without prejudice.

**D.    The government's motion in limine to preclude (1) admission of any late or undisclosed reciprocal discovery and (2) admission at trial of any unnoticed affirmative defenses**

On August 17, 2018, the government also filed a motion in limine to preclude the admission of any late or undisclosed reciprocal discovery. Dkt. 790 ("MIL 8") at 1. The government avers that it has requested reciprocal discovery from defendants, but that defendants have neither produced any discovery, nor objected to the government's request. Id. The government also moves to preclude admission of any defense which is subject to mandatory disclosure, or any affirmative defense lacking a sufficient offer of proof. Id. If defendants intend to raise an entrapment or duress defense, the government asks the Court to order defendants to submit a pretrial offer of proof. Id. at 4. The government argues that if defendants fail to make a prima facie showing, they should be precluded from conducting cross-examination or eliciting testimony related to these defenses. Id. Should defendants raise a duress or entrapment defense, the government further moves to admit evidence relevant to defendants' history of criminal conduct. Id. at 5.

On January 25, 2019, Apodaca filed an opposition to the government's motion. Dkt. 914 ("Opp'n 8A"). On January 28, 2019, Montoya filed an opposition, as well. Dkt. 928 ("Opp'n 8M"). Defendants do not state that they have produced any discovery for the government, but they aver that they will comply with their discovery obligations. Opp'n 4A at 3. They also represent that they "welcome[] the opportunity to establish a mutually agreed-upon discovery cut-off date for the parties." Id. Defendants state that, although they do not intend to raise an alibi defense, the government failed to properly request notice of an alibi defense in accordance with Federal Rule of Criminal Procedure 12.1. Id. at 4. Defendants appear to argue that the government failed to state the "time, date, and place of the alleged offense" in the request, as required by Rule 12.1. Id. Defendants also argue that the government is not entitled to notice of an entrapment or duress defense.

**i.    Reciprocal Discovery**

Federal Rule of Criminal Procedure 16(b) imposes discovery obligations on defendants who have requested and received discovery from the government. Fed. R. Crim. P. 16(b). The Ninth Circuit has affirmed sanctions where this discovery obligation is not met. See, e.g., United States v. Scholl, 166 F.3d 964, 972 (9th Cir. 1999), as amended on denial of reh'g (Mar. 17, 1999) (affirming a district court's decision to exclude evidence which was not produced by the defense until after the jury was sworn and where the court found that the exclusion was deliberate). In this case, trial remains over a month away. Accordingly, the Court declines to rule on the admissibility of hypothetical evidence that was not properly disclosed.

### ii.    Affirmative Defenses

Regarding the government's requests about affirmative defenses, "[a]s a general proposition a defendant is entitled to an instruction as to any recognized defense for which there exists evidence sufficient for a reasonable jury to find in his favor." Mathews v. United States, 485 U.S. 58, 63 (1988).  Federal Rule of Criminal Procedure 12 does not specify disclosure requirements for the affirmative defenses of entrapment or duress.  The Ninth Circuit has held that "a district court may require a defendant to submit a pretrial offer of proof on an entrapment defense; if the defendant fails to make a prima facie showing, the district court may preclude him from presenting the defense at trial." United States v. Gurolla, 333 F.3d 944, 952 (9th Cir. 2003).  However, courts are not obligated to follow this procedure.  The Ninth Circuit has also ruled that,

> [t]o raise entrapment, defendant need only point to evidence from which a rational jury could find that he was induced to commit the crime but was not otherwise predisposed to do so . . . . Defendant need not present the evidence himself; he can point to such evidence in the government's case-in-chief, or extract it from cross-examination of the government's witnesses. The burden then shifts to the government to prove beyond a reasonable doubt that defendant was not entrapped.

United States v. Poehlman, 217 F.3d 692, 698 (9th Cir. 2000) (internal citation omitted).  Although the Ninth Circuit did not expressly rule on whether pretrial notice of a duress defense was required, in United States v. Chi Tong Kuok, 671 F.3d 931 (9th Cir. 2012), the Court vacated a defendant's conviction because the district court did not permit him to present a duress defense after the defendant first raised the defense at trial.[6]  As the government argues, should defendants raise these defenses, the government will have the opportunity to present rebuttal evidence.  Poehlman, 217 F.3d at 698; United States v. Verduzco, 373 F.3d 1022, 1029 (9th Cir. 2004).

It is unclear at this stage whether defendants intend to present defenses of entrapment or duress.  Defendants are directed to notify the government and the Court of their intentions as soon as they make a decision concerning this issue.  In the event that defendants decide to raise one or both of these defenses, the Court will request defendants to make a prima facie showing of the facts they intend to prove to support the defense.  The parties are directed to meet and confer regarding any remaining questions regarding the government's request for notice of an alibi defense.

---

[6]      In Chi Tong Kuok, the Ninth Circuit explained that the government objected to the duress defense at trial because it had not received notice of it.  671 F.3d at 936 n.2.  However, the government did not brief the issue on appeal, and the Ninth Circuit did not rule on notice requirements.  Id.

The government's motion is accordingly **DENIED** without prejudice.

### E.     The government's motion in limine to preclude the introduction of inadmissible hearsay

Finally, on August 17, 2018, the government also moved to preclude defendants from introducing inadmissible hearsay.  Dkt. 792 ("MIL 9").  Specifically, the government seeks to bar defendants from introducing segments of audio recordings or other statements which contain statements by defendants or their co-conspirators.  Id. at 5.  As the government explains:

> The government will seek to introduce at trial a number of [audio recordings] containing defendants' and their co-conspirators' statements.  The evidence is not hearsay because the statements are party admissions, as well as co-conspirator statements, admissible under Federal Rules of Evidence 801(d)(2)(A) and (d)(2)(E).  But those recordings are inadmissible hearsay if introduced by defendants.

Id. at 1.

On January 24, 2019, Jackson filed an opposition to the government's motion.  Dkt. 901 ("Opp'n 9J").  On January 25, 2019, Apodaca filed an opposition, as well.  Dkt. 915 ("Opp'n 9A").  Defendants call the government's motion overly-broad and premature.  They argue that, while the rule against hearsay generally does not permit defendants to offer their own out-of-court statements, valid exceptions may apply, particularly under the rule of completeness. Opp'n 9J at 1, Opp'n 9A at 3.

A defendants' "non-self-inculpatory statements are inadmissible even if they were made contemporaneously with other self-inculpatory statements."  United States v. Ortega, 203 F.3d 675, 682 (9th Cir. 2000), holding modified by United States v. Larson, 495 F.3d 1094 (9th Cir. 2007) (citing Williamson v. United States, 512 U.S. 594, 599 (1994).  If the Court admitted defendants' exculpatory statements at trial, defendants "would [be] able to place [their] exculpatory statements 'before the jury without subjecting [themselves] to cross-examination, precisely what the hearsay rule forbids.'"  Ortega, 203 F.3d at 682 (quoting United States v. Fernandez, 839 F.2d 639, 640 (9th Cir.1988)).

Under Rule 106, "[i]f a party introduces all or part of a writing or recorded statement, an adverse party may require the introduction, at that time, of any other part—or any other writing or recorded statement—that in fairness ought to be considered at the same time."  Fed. R. Evid. 106.  Rule 106 "exists to avert 'misunderstanding or distortion' caused by introduction of only part of a document."  United States v. Vallejos, 742 F.3d 902, 905 (9th Cir. 2014) (quoting Beech Aircraft Corp. v. Rainey, 488 U.S. 153 (1988)).  The Rule "does not, however, require the introduction of any unedited writing or statement merely because an adverse party has

introduced an edited version." Id.; see also United States v. Collicott, 92 F.3d 973, 983 (9th Cir. 1996) ("[I]t is often perfectly proper to admit segments of prior testimony without including everything, and adverse parties are not entitled to offer additional segments just because they are there and the proponent has not offered them.") (internal quotation marks omitted).  What is admitted under the rule of completeness depends on the content itself. Vallejos, 742 F.3d at 905.  Additionally, Rule 106 "does not compel admission of otherwise inadmissible hearsay evidence." Collicott, 92 F.3d at 983 (internal quotation omitted).

Without knowledge of what segments of the audio recordings the government intends to offer at trial, as well as what portions of the audio recordings defendants may then seek to introduce and for what purpose, the Court cannot rule this motion.  The Court therefore directs the parties to produce this evidence for the Court's review.  The government should produce the portions of the audio recordings that it intends to introduce two weeks before trial.  One week after the government produces its audio recording segments, defendants will then identify any additional segments of the recordings that they may seek to offer.  Defendants should specify the purpose for which they are offered.

Accordingly, the Court **RESERVES** ruling on this matter until it is in receipt of the parties' proposed evidence.

## IV.  DEFENDANTS' MOTIONS IN LIMINE REGARDING TRIAL PROCEDURES AND MECHANICS

### A.    Defendants' motion for additional peremptory challenges

On January 13, 2019, defendant Jackson filed a motion for additional peremptory challenges, pursuant to Federal Rule of Criminal Procedure 24(b).  Dkt. 860 ("MIL 10").  Defendants Montoya and Vega joined in the motion.  Dkts. 888, 908.  The government filed an opposition on January 22, 2019.  Dkt 882 ("Opp'n 10").

Under Federal Rule of Criminal Procedure 24, the government is allotted 6 peremptory challenges and, in a non-capital felony matter, defendants may jointly exercise 10 challenges. Fed. R. Crim. Pro. 24(b).  However, in its discretion, "[t]he court may allow additional peremptory challenges to multiple defendants, and may allow the defendants to exercise those challenges separately or jointly." Fed. R. Crim. P. 24(b).  Defendants contend that they should be provided additional peremptory challenges to "ameliorate, to some degree, the risk of prejudice arising from the multi-defendant trial."  MIL 10 at 2.  Defendants request the Court to grant at least three additional peremptory challenges per defendant, totaling fifteen peremptory challenges in addition to the ten challenges provided by statute.  Id.

In response, the government argues this case is unexceptional, and that the Ninth Circuit has repeatedly affirmed that the standard number of peremptory challenges, as provided by Rule

24(b), suffices in multi-defendant cases.  Opp'n 10 at 1 (citing <u>United States v. McClendon</u>, 782 F.2d 785, 786–88 (9th Cir. 1986) (affirming a district court's decision to deny additional peremptory challenges in a multi-defendant case)).  The government also argues that allotting defendants twenty-five peremptory challenges "would create a gross disparity" between the number of challenges awarded to the defendants as opposed to the government.  <u>Id.</u> at 2.  At oral argument, the government also requested that, if the Court grants defendants additional peremptory challenges, that the government receive additional challenges in proportion to the number defendants receive.

The Court hereby grants defendants five additional challenges, one per defendant in this trial.  Combined with the ten peremptory challenges provided by Rule 24(b)(2), defendants may now exercise a total of fifteen challenges.  Defendants may divide these challenges as they wish.  Defendants' motion for additional peremptory challenges is accordingly **GRANTED** in part and **DENIED** in part.  The government's request for additional peremptory challenges is **DENIED**.

### B.    Defendants' motion for a preliminary jury instruction

On January 13, 2019, defendant Jackson also filed a motion requesting a preliminary jury instruction addressing the legality of membership in the Mexican Mafia.  Dkt. 861 ("MIL 11").  Defendants Montoya and Vega joined in the motion.  Dkts. 888, 908.  Defendants anticipate that the government's opening argument will emphasize the criminal activity of the Mexican Mafia.  MIL 11 at 1.  Accordingly, "[w]ithout proper guidance from the Court, the jury will be impermissibly prejudiced by the time of the government's opening argument by the erroneous belief that membership in the prison gang is *per se* evidence of the criminal conduct charged."  <u>Id.</u>  Defendants request that the Court advise the jury (1) that no law establishes that the Mexican Mafia is an illegal organization; (2) that membership in the Mexican Mafia is not illegal; and (3) that membership in the Mexican Mafia is not an element of the charged crimes.  <u>Id.</u> at 2.  Defendants argue that this instruction will help preserve defendants' presumption of innocence.  <u>Id.</u>

The government filed a response on January 22, 19. Dkt 883 ("Resp. 11").  The government represents that it will meet and confer with defendants to discuss a proposed jury instruction.  <u>Id.</u> at 2. The government stated that it would submit either a joint or disputed instruction after this meeting.  <u>Id.</u>  The parties should provide this preliminary jury instruction no later than two weeks before the start of trial.  At this time, the Court also directs the parties to submit to the Court a joint statement of the case.

**C.      Defendants' request for notice of proposed trial logistics**

On January 13, 2019, defendant Jackson also filed a request for notice of proposed trial logistics. Dkt. 862 ("MIL 12"). Defendants Montoya and Vega joined in the motion. Dkts. 888, 908. Defendants specifically requested the following information:

(1) how the Court proposes to configure the courtroom to accommodate the five defense teams scheduled for trial;

(2) how the Court intends to inform potential jurors of the charges in the Indictment, and, if the Court intends to read the Indictment to the jury and/or provide the jury with a copy of the Indictment;

(3) details regarding jury selection, including the number of jurors the Court intends to summon, which jury questionnaire the Court intends to distribute, when the Court will distribute the questionnaire, and the time period that the Court will provide for counsel to review the questionnaires;

(4) information regarding trial scheduling, including trial days, hours, and days the Court will not be in session; and

(5) whether any special security and/or other measures will be implemented during the course of the trial.

MIL 12 at 1. The government does not object to defendants' request for notice of proposed trial logistics. Dkt. 884 ("Resp. 12") at 2. It states that this information would be useful to the government, as well. Id.

However, the government also urges the Court to adopt the jury questionnaire that it provided to the Court on August 17, 2018. Id. at 2; Dkt. 795 ("Proposed Questionnaire"). The government further proposes that potential jurors complete the questionnaire on Tuesday, February 26, 2019—one week prior to trial. Resp. 12 at 2. Finally, the government states its belief that prospective jurors need not fill out the questionnaire in the presence of defendants. Id. The government contends that defendants need only be present during voir dire itself. Id. (citing United States v. Greer, 285 F.3d 158 (2nd Cir. 2002)). Still, "out of an abundance of caution, the government requests that each defendant waive his or her presence during the filling out of the juror questionnaires for the sake of judicial efficiency." Resp. 12 at 3.

The Court will inform the parties of proposed trial logistics as information becomes available. At this time, the Court can respond to defendants' second question regarding the Court's procedure for informing jurors of the charges in the Indictment. The Court will provide a copy of the Indictment to the jury at the end of trial, along with the jury instructions. The Court also informs the parties that trial will proceed in the complex-courtroom, the same

courtroom where the Court has held the pre-trial hearings in this case.  The Court will follow the security protocols that the United States Marshall Service recommends.  As trial draws closer, the Court will provide more details regarding trial logistics, and a more precise trial schedule.  The Court recognizes that all parties reserve their rights to raise or respond to certain logistical issues that arise in the future.

In response to the government's additional requests, at oral argument, defendants orally waived their presence while jurors complete the juror questionnaire for this case.  Additionally, at a subsequent hearing on **Monday, February 11, 2019**, the Court heard oral argument and issued oral rulings regarding the parties' proposed juror questionnaire.  The parties are directed to submit the amended questionnaire, revised in accord ance with the Court's rulings, by **March 13, 2019.**

Defendants' motion is accordingly **GRANTED** in part and **DENIED** in part.

### D.      Defendants' motion in limine for advanced notice of government's exhibits, and witnesses to be called and topics to be covered during a trial week

Defendant Jackson also filed a motion for notice, on the Thursday or Friday before each week of trial, of the government's witnesses to be called, topics to be covered, and exhibits to be used.  Dkt. 873 ("MIL 13") at 1.  Defendants Montoya and Vega joined in the motion.  Dkts. 888, 908.  Defendants explain that, "[i]f [defendants are] provided advance notice of the government's exhibit list and exhibits, and [of] what witnesses are scheduled and the topics to be covered in any given trial week, then [defendants] can then more accurately anticipate what issues may need to be resolved prior to the presentation of a particular witnesses testimony." MIL 13 at 2.

On January 24, 2019, the government opposed defendants' motion.  Dkt. 890 ("Opp'n 13").  Although the government states that it will inform defendants of the witnesses it intends to call forty-eight hours in advance, it believes that one week's notice could present security concerns.  Id. at 1.  The government also objects to providing a list of topics for each witness. Id.  However, the government offers to provide defendants with a complete witness and exhibit list for the entire trial, which will specify the exhibits for each witnesses to be called.  Id.

The Court hereby rules that both parties must provide forty-eight hours' notice of any witnesses they intend to call.  The parties need not disclose the order in which they intend to call the witnesses, nor the topics the witnesses will cover.  The government will provide its complete witness and exhibit list two weeks prior to the start of trial.  The Court leaves open the procedure to be followed in the event that defendants decide to put on a defense.

Defendants' motion is accordingly **GRANTED** in party and **DENIED** in part.

## V.   DEFENDANTS' MOTIONS IN LIMINE TO EXCLUDE CERTAIN GOVERNMENT WITNESSES

On January 17, 2019 defendant Jackson filed two motions to exclude the testimony of government witnesses: a motion to exclude or limit the exert testimony of Drug Enforcement Administration ("DEA") Group Supervisor Victor Vazquez ("SA Vazquez") and DEA Special Agent Brendan Hanratty ("SA Hanratty"), dkt. 865 ("MIL 14"), and a motion to exclude or limit testimony from former BOP Special Investigative Agent John Feeney ("Feeney"), California Department of Corrections and Rehabilitation ("CDCR") Senior Special Agent John Castanedo ("SSA Castanedo"), and Pasadena Police Officer Jose Urita, dkt. 866 ("MIL 15"). Defendants Montoya and Vega joined in the motions. Dkts. 888, 908. The government filed oppositions on January 24, 2019. Dkts. 907 ("Opp'n 14"), 889 ("Opp'n 15"). On January 24, 2019, defendant Vega filed a motion in limine to exclude the expert testimony of FBI Special Agent Tyler Call ("SA Call"). Dkt. 890 ("MIL 16").[7] The government filed an opposition on January 31, 2019. Dkt. 939 ("Opp'n 16").

### A.   Legal Standard

### i.   Federal Rule of Evidence 702

"Rule 702 of the Federal Rules of Evidence allows for expert, opinion testimony by a 'witness qualified as an expert by knowledge, skill, experience, training or education' where the testimony will 'assist the trier of fact to understand' matters of 'scientific, technical, or other specialized knowledge.'" United States v. Reed, 575 F.3d 900, 922 (9th Cir. 2009) (citing Fed. R. Evid. 702). The Rule 702 inquiry "entails a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue." Daubert v. Merrell Dow Pharms., Inc., 509 U.S. 579, 592–93 (1993). Importantly, however, Daubert's "gatekeeping obligation" "applies not only to testimony based on 'scientific' knowledge but also to testimony based on 'technical' and 'other specialized' knowledge." Kumho Tire Company v. Carmichael, 526 U.S. 137, 141 (1999). "[I]n considering the admissibility of testimony based on some 'other specialized knowledge,' Rule 702 generally is construed liberally." United States v. Hankey, 203 F.3d 1160, 1168 (9th Cir. 2000).

---

[7]      Although the deadline to file motions in limine was January 17, 2019, dkt. 810, on the same day that he filed his motion in limine, Vega also filed an *ex parte* application for an order shortening time for the service and filing of his motion. Dkt. 891. The government filed an opposition to Vega's *ex parte* application on January 25, 2019, asking the Court to strike the motion as untimely. Dkt. 919 at 2. The Court provisionally accepted defendant Vega's motion, as filed, on January 29. 2019. Dkt. 932.

Rule 702 expressly contemplates the expert testimony of qualified law enforcement officers.  The Advisory Committee notes to Rule 702 explain that "the method used by the agent is the *application of extensive experience* . . . ., [and s]o long as the principles and methods are reliable and applied reliably to the facts of the case, this type of testimony should be admitted."  Fed. R. Evid. 702 advisory committee's note to 2002 amendment (providing, as an example, a law enforcement agent who provides expert testimony to decode language in a drug transaction) (emphasis added).  The Ninth Circuit has also upheld expert testimony by law enforcement agents on numerous topics.  See, e.g., United States v. Anchrum, 590 F.3d 795, 804 (9th Cir. 2009) ("[L]aw enforcement experts may 'testify as to the general practices of criminals to establish the defendants' modus operandi' which 'helps the jury to understand complex criminal activities, and alerts it to the possibility that combinations of seemingly innocuous events may indicate criminal behavior.'") (quoting United States v. Freeman, 498 F.3d 893, 906 (9th Cir. 2007)); United States v. Patterson, 819 F.2d 1495, 1507 (9th Cir. 1987) (permitting expert testimony about the operations of criminal narcotics distribution organizations to help the jury understand a heroin distribution scheme involving twenty-plus members of a structured criminal enterprise); United States v. Vera, 770 F.3d 1232, 1241 (9th Cir. 2014) ("Drug jargon is well established as an appropriate subject for expert testimony and investigating officers may testify as drug jargon experts who interpret the meaning of code words used in recorded calls.")

Expert testimony may rely on inadmissible hearsay provided that such hearsay is reasonably relied upon by experts in their field.  Fed. R. Evid. 703; United States v. Cazares, 788 F.3d 956, 977 (9th Cir. 2015).  However, "to the extent that inadmissible evidence is reasonably relied upon by an expert, a limiting instruction typically is needed to limit the use of that evidence."  Id. (citing United States v. Grace, 504 F.3d 745, 759 n.7 (9th Cir.2007)).

"At the defendant's request, the government must give to the defendant a written summary of any testimony that the government intends to use under Rules 702, 703, or 705 of the Federal Rules of Evidence during its case-in-chief at trial."  Fed. R. Crim. P. 16(a)(1)(G).  Rule 16(a)(1)(G) provides that the government's written summary of expert witness testimony must describe the witness's opinions, the bases and reasons for those opinions, and the witness's qualifications.  Id.  An Advisory Committee Note to Rule 16 provides that this expert summary is intended to "minimize surprise that often results from unexpected expert testimony and . . . to provide the opponent with a fair opportunity to test the merit of the expert's testimony through focused cross-examination."  Fed. R. Crim. P. 16 advisory committee's note to 1993 amendment.

## ii.    Federal Rule of Evidence 701

In contrast to expert testimony, lay testimony under Rule 701 must be "(a) rationally based on the witness's perception; (b) helpful to clearly understanding the witness's testimony or to determining a fact in issue; and (c) not based on scientific, technical, or other specialized

knowledge within the scope of Rule 702." Fed. R. Evid. 701.  Lay testimony may not be "based on speculation, rely on hearsay or interpret unambiguous, clear statements." Vera, 770 F.3d at 1242 (citing Freeman, 498 F.3d at 905).  However, an officer offering lay testimony "may interpret 'ambiguous conversations based upon his direct knowledge of the investigation,' including his 'direct perception of several hours of intercepted conversations . . .  and other facts he learned during the investigation.'" Id. at 1243 (citing Freeman at 904–05); see also United States v. Gadson, 763 F.3d 1189, 1208 (9th Cir. 2014) ("A lay witness's opinion testimony necessarily draws on the witness's own understanding, including a wealth of personal information, experience, and education, that cannot be placed before the jury.").

"[T]he line between lay and expert opinion depends on the basis of the opinion, not its subject matter." United States v. Barragan, 871 F.3d 689, 704 (9th Cir. 2017).  For example, "law enforcement testimony about the meaning of drug jargon may be both expert and lay testimony, depending on the circumstances." Gadson, 763 F.3d at 1212 (quoting United States v. Reed, 575 F.3d 900, 922 (9th Cir. 2009)).

**B.     Defendants' motion in limine to exclude or limit expert testimony from Victor Vasquez and Brendan Hanratty**

The government represents that it may call SA Vazquez to testify in this trial.[8]  In its expert disclosure statements to defendants, the government stated that SA Vazquez would testify on: the history, structure, organization, modius operandi, security measures and operational capabilities of LFM/LCT; methods utilized by LFM/LCT to obtain and manufacture methamphetamine; costs of a drug operation; prices for methamphetamine; methods to smuggle drugs across borders; alliances of LFM/LCT; and why and how the Project would be of benefit to LFM.  Dkt. 865-1 ("Exp. Discl.") at 3; Dkt. 865-2 ("Suppl. Discl.") as 2.

Defendants move to exclude this testimony.  Defendants argue that the testimony of SA Vasquez does not meet the requirements of Rule 702, and will impermissibly admit hearsay evidence.  MIL 14 at 2. Defendants also argue that the government has failed to satisfy its expert notice requirements, as mandated by Federal Rule of Criminal Procedure 16(a)(1)(G). Id. at 4–6 ("The government's expert notice for Vasquez and/or Hanratty fails to provide any information about the bases and reasons for the witnesses [sic] testimony, other than it comes from each witnesses work for some period of time as DEA agents.").  Finally, defendants contend that the expert testimony should be excluded pursuant to FRE 403 because the

---

[8]     Although the government previously provided notice that it may call SA Hanratty at trial, as well, the government now represents that it will only call Vazquez to testify.  Opp'n 1 at 5, n.5.  However, the government contends that its arguments in support of Vazquez's expert testimony "apply equally to Hanratty." Id.  The Court will rule exclusively as to the admissibility of Vazquez's testimony.  To the extent that defendants moved to exclude testimony by SA Hanratty, the Court **DENIES** defendants' motion, without prejudice, as moot.

testimony "is based entirely on hearsay and has not been the subject of research, fact checked sources, or critical analysis," and will "invite the jurors to convict [defendants] based on the dangerous nature of the individuals with whom [they] allegedly associated." Id. at 7.

In response, the government explains that it requires SA Vazquez's testimony to help the jury decipher and understand the audio recordings it intends to offer at trial. "Because of the often vague, coded, cryptic, or out of context nature of these discussions, the government intends to present testimony from a leading DEA expert on drug cartels and the La Familia drug cartel specifically in order to aid the jury in understanding these discussions." Dkt. 907 ("Opp'n 14") at 2. The government also argues that SA Vazquez's fifteen- plus years of experience as a DEA agent qualify him to testify on these matters, and that Vazquez has previously testified on similar matters. Id. at 5–6. The government contends that it satisfied its notice obligations, pursuant to Rule 16. Id. at 4. However, to better clarify the specific topics that Vazquez would cover in expert testimony, the government attached a list of the audio recordings about which Vazquez would opine. See Opp'n 14, Ex. 1. The government also identified which topics SA Vazquez would specifically address for each recording. Opp'n 14 at 7–13.

The Court has reviewed the government's notice of expert disclosure and discovery, as provided to defense on May 8, 2015, and as attached to defendants' motion. The Court has also reviewed the government's supplemental expert disclosure, provided to the defense on July 25, 2018, and attached to defendants' motion. These Rule 16 disclosures provide detailed information of SA Vazquez's knowledge, training and experiences in gang-related operations and law enforcement investigations. See Exp. Discl. at 2. SA Vazquez has over fifteen years of experience working with the DEA, opp'n 14 at 5, which includes an assignment to the Mexico City Country Office ("MCCO") Enforcement Group, where he investigated drug trafficking organizations, including La Familia, exp. discl. at 2. This renders him particularly knowledgeable of the organizations in this case, and qualified to testify as an expert witness. Hankey, 203 F.3d at 1169 (affirming an expert's ability to testify as an expert where he "had devoted years working with gangs, knew their 'colors,' signs, and activities").[9]

While defendants express concern that "[t]he government's proffered 'opinions' of SA Vazquez . . . regarding the 'history' of Mexican drug cartels, generally, and La Familia, specifically, are merely recitations of hearsay evidence without applying any expertise, and are inadmissible under Rule 702," the Court disagrees. MIL 14 at 4. The Ninth Circuit has been clear that experts may testify to the workings and mechanics of criminal organizations in order

---

[9]      Although the government notes that Vazquez has previously testified in the New York trial of Joaquín Archivaldo Guzmán Loera ("El Chapo"), "whom Vazquez personally helped capture," at oral argument the government clarified that in that case, SA Vazquez testified as a percipient witness. Opp'n 14 at 2.

to help the jury understand complex criminal activity.  See Anchrum, 590 F.3d at 804; Patterson, 819 F.2d at 1507.  As the government explains, Vazquez's expert testimony will help contextualize and explain the audio recordings that the government intends to offer into evidence.  Opp'n 14 at 7 ("Vazquez's expert testimony regarding each topic will help explain otherwise difficult to understand topics discussed in the recordings that the government intends to admit into evidence.").  In addition, expert witnesses may rely on reasonable inadmissible hearsay in their testimony.  Fed. R. Evid. 803.  Where this occurs, the Court will cure any prejudice with a limiting instruction.  Cazares, 788 F.3d at 977.

The Court also finds defendants' argument that the government failed to satisfy its Rule 16 requirements unpersuasive.  As previously noted, the government provided defendants expert witness disclosures on May 8, 2015, and the government supplemented these disclosures on July 25, 2018.  These Rule 16 disclosures provide detailed information of Vazquez's knowledge, training and experiences in gang-related operations and law enforcement investigations.  See Exp. Discl. at 2.  The July 2018 supplemental disclosure also identifies, in details, the specific topics his expert testimony would cover.  Suppl. Discl. at 2– 10.  The Court understands that, in addition to these expert notice disclosures, the government has also provided defendants with over 400 pages of materials that support the expert testimony, including source materials and training presentation materials.  Opp'n 14 at 5.  These disclosures give defendants adequate notice of what Vazquez will testify to at trial, and they accordingly satisfy the government's obligations under Rule 16.  See United States v. Toliver, 380 Fed. Appx. 570, 574 (9th Cir. 2010) (reasoning that a Rule 16(a)(1)(G) notice was adequate when detectives' knowledge, experience, and investigation of gang activity, as proffered in the Rule 16(a)(1)(G) notice, also provided a sufficient foundation for their testimony); see also United States v. King, 703 F. Supp. 2d 1063, 1077 (D. Haw. 2010) (finding that the government's disclosure of an expert witness' curriculum vitae and a copy of her testimony in an unrelated case satisfied Rule 16 disclosures).

In sum, the Court declines to exclude the expert testimony of the government's witness, SA Vazquez.  Defendants' motion is **DENIED**.

**C.     Defendants' motion in limine to exclude or limit testimony from John Feeney, John Castanedo, and Jose Urita**

In addition to calling Vazquez, the government indicates that it also intends to call former U.S. Bureau of Prison ("BOP") Special Investigative Agent John Feeney ("Feeney") and California Department of Corrections and Rehabilitation ("CDCR") Senior Special Agent John Castanedo ("SSA Castanedo") to testify both as percipient and as expert witnesses.  Per the government, Feeney will testify, as an expert witness, about the structure, organization, operations, rules, symbols and history of La Eme.  He will also testify about terms related to La Eme, forms of communications, and nicknames.  Finally, Feeney will provide an expert opinion about the meaning of certain tattoos worn by defendants.  The government states that it will also

call Feeney as a lay witness to testify about his role in the investigation. Based on his involvement in the investigation, Feeney will provide his lay interpretation of BOP recorded calls related to the Project.

The government indicates that, as an expert witness, SSA Castanedo will be called to testify about the structure, organization, operations, methods of communications, and hierarchy of La Eme within the California state prison system. This testimony will include discussion of La Eme members on "death row" at San Quentin State Prison. SSA Castanedo will also testify about the CDCR's process for validating La EME members and the identification [of] certain La Eme members by the CDCR. The government explains that, "[i]n contrast to Mr. Feeney's expert testimony that will discuss the entire structure of La Eme's organization throughout the U.S., SSA Castanedo's expert testimony will focus on La Eme in the CDCR prison system and the relationship between La Eme members in CDCR to Hispanic street gangs in Southern California." Opp'n 15 at 7. In addition, SSA Castanedo will testify as a percipient witness about his interpretation of kites sized from an inmate at San Quentin State Prison. The government anticipates that SSA Castanedo will provide a lay opinion that the intended recipients of these kites were EME members, housed on "death row" at Pelican Bay State Prison. Based on his involvement in the investigation, the government expects that SSA Castanedo will also provide his lay interpretation of recorded meetings and calls between CS-1, defendants, and co-conspirators.

The government also intends to call Pasadena Police Officer Jose Urita ("Officer Urita") to testify as a percipient witness. During the investigation, Officer Urita worked as a DEA Task Force Officer. Opp'n 15 at 10. In this capacity he oversaw, and was the affiant for, a half-dozen Title III wiretaps that intercepted defendants in this investigation. Id. He will testify about the meaning of certain recorded conversations, based on his participation in the investigations. Id. at 11.

Defendants move to exclude or limit the testimony of Feeney, SSA Castanedo, and Officer Urita. Defendants argue that this testimony should be excluded because Feeney and SSA Castanedo do not meet the requirements of Rule 702, MIL 15 at 2–5, and that none of the witnesses meet the requirements of Rule 701, id. at 5. Defendants further contend that the government has not satisfied its Rule 16 disclosure requirements for these witnesses. Id. at 6. Finally, defendants argue that permitting the same officer to serve as both an expert and lay witness "will risk elevating all opinions of these law enforcement officers to the status of expert opinions and exacerbate the danger [that] the jurors will give these officers' testimony undue deference." MIL 15 at 1–2. The government opposes defendants' motion on all grounds. Opp'n 15 at 1–2.

The Court has reviewed the government's Rule 16 disclosures discussing the experience of and expert testimony topics for Feeney and SSA Castanedo. The Court finds that, as with Vazquez, Feeney and SSA Castanedo's training and experience qualify them to testify as expert

witnesses. Feeney was employed by the Department of Justice Federal Bureau of Prisons for twenty-five years. Exp. Discl. at 3. In his capacity as a BOP Special Investigative Agent, he monitored the members of prison gangs, and interviewed hundreds of gang members. He was regularly requested by BOP to provide guidance on gang-related incidents. Id. He has previously testified as an expert witness in cases in this district. See, e.g., United States v. Muro-Inclain, 597 F. App'x 936, 938 (9th Cir. 2015) (affirming Feeney's testimony as an expert witness because "he had worked as a correctional officer and special investigative agent for the Bureau of Prisons for over eighteen years, and that he had considerable experience with, and training on, the Surenos and Mexican Mafia prison gangs"). Similarly, SSA Castanedo has worked in street gang enforcement in Southern California for over twenty years. Opp'n 15 at 8. He is currently an investigative agent with the CDCR. As part of his work at the CDCR, he has been assigned to assist law enforcement gang units, and to provide training regarding gang activities, trends, and gang investigation. Exp. Discl at 5. SSA Castanedo has also testified in prior cases in this district. Opp'n 15 at 9.

As with Vazquez, the government adequately informed defendants of the expert testimony to be offered by Feeney and SSA Castanedo to satisfy Rule 16. In addition to the disclosures included in the government's May 2015 expert disclosure report, on June 1, 2018, the government disclosed additional information about the testimony these witnesses would provide. See Dkt. 889-2, Ex. 2 ("June Suppl Discl."). These detailed disclosures are quite precise. For example, the government listed sixty-three words that appear on the government's audio recordings, which the government intends for Feeney to interpret for the jury. Id.

Finally, the Court also concludes that Feeney, SSA Castanedo and Officer Urita may all testify as percipient witnesses. They participated in the investigation and may testify to that which they personally witnessed during that time. This testimony is expressly contemplated by Rule 701. Gadson, 763 F.3d at 1206 (citing Freeman, 498 F.3d at 904–05) (explaining that "an officer's interpretation of intercepted phone calls may meet Rule 701's 'perception' requirement when it is an interpretation 'of ambiguous conversations based upon [the officer's] direct knowledge of the investigation'"); Reed, 575 F.3d at 922.

In response to defendants' opposition to permitting a single officer to testify as both a percipient witness and an expert witness, the Court acknowledges that the Ninth Circuit has also voiced concerns about this practice. "Such dual capacity testimony raises additional concerns, however: an agent's status as an expert could lend him unmerited credibility when testifying as a percipient witness, cross-examination might be inhibited, jurors could be confused and the agent might be more likely to stray from reliable methodology and rely on hearsay." Vera, 770 F.3d at 1242; see also Anchrum, 590 F.3d at 803.

However, the Ninth Circuit still permits officers to testify in both capacities, with constraints. District courts are encouraged to segregate dual testimony and they must instruct the jury regarding "what the attendant circumstances are in allowing a government case agent to

testify as an expert." <u>Vera</u>, 770 F.3d at 1242 (quoting <u>Freeman</u>, 498 F.3d at 904). In its opposition brief, the government represents that it will follow these protocols, and at oral argument, it promised that there would be a "wholesale line of separation"—demarcating when an officer testified as an expert as opposed to a lay witness. Opp'n 15 at 21. The Court will also issue limiting instructions where clarify the capacity in which an individual testifies. This will ensure that there is no "'blurred distinction' between [an officer's] expert and lay testimony." <u>Anchrum</u>, 590 F.3d at 803.

Accordingly, defendants' motion is **DENIED**.

## D. Defendants' motion in limine to exclude the testimony of Tyler Call

SA Call is being called by the government to testify regarding the Mara Salvatrucha street gang ("MS-13"), with specific topics ranging from the origins of MS-13 in Los Angeles to MS-13's association with the Mexican Mafia and the recognition of MS-13 members as Surenos. Opp'n 16 at 4.[10] The government argues that this testimony is relevant because Vega was a leader of MS-13, and that Vega leveraged MS-13 to further the objectives of the Project. <u>Id.</u> at 2. The government represents that Vega repeatedly references MS-13 on the audio recordings that the government intends to offer into evidence, and the government argues that SA Call's testimony will explain these "vague" references. <u>Id.</u>

Defendants move to exclude SA Call's expert testimony. MIL 16 at 1.[11] Defendants first object to SA Call's testimony because they contend that it is irrelevant under Federal Rules of Evidence 401 and 402, and that it would unfairly prejudice Vega, pursuant to Rule 403. MIL 16 at 4, 6. "In the present case, there is absolutely no reason why the jury would need to hear expert testimony about MS-13. It is entirely irrelevant to the drug charges. . . . Furthermore, mention of the gang will be horribly prejudicial." <u>Id.</u> at 7 (citing "Why was MS-13 Targeted in Trump's Speech?", <u>The New York Times</u>, January 31, 2018). Defendants further contend that the government's disclosures about SA Call's testimony do not adequately inform defendants of the "precise opinions being offered, and the bases for the opinion." <u>Id.</u> at 6–8. Defendants request the Court to hold an evidentiary hearing to assess the admissibility of SA Call's expert qualifications and opinion, pursuant to Rule 702. <u>Id.</u> at 8.

The Court has reviewed the government's disclosures regarding SA Call's qualifications, and the topics he would address at trial. <u>See</u> MIL 16, Ex. A at 7– 8. Based on the record before it, the Court tentatively excludes SA Call's testimony, subject to a more robust showing of relevancy. Currently, the government alleges that Vega leveraged his MS-13 membership to

---

[10]    On its initial disclosures provided to defendants, the government previously stated that SA Call would also testify as a drug expert. However, the government now confirms that SA Call will only testify as an expert on MS-13. Opp'n 16 at 5.

[11]    Defendant Jackson joined in Vega's motion on February 3, 2019. Dkt. 941.

further the objectives of the Project. However, the Court does not find, based on the record before it, that this contention is sufficiently relevant and probative to outweigh the prejudicial effect this testimony would have. At oral argument, Vega averred that he did not intend to argue that he could not have participated in a conspiracy with the Mexican Mafia because he was a member of MS-13. The government states that MS-13 is associated with the Mexican Mafia, and thus relevant to this case. Opp'n 16 at 4. However, the Court does not find that identifying the specific subgroup of the Mexican Mafia with which Vega was allegedly associated is sufficiently probative, given the prejudicial effect.

Defendants' motion is therefore tentatively **GRANTED**, subject to a more robust showing of the relevance of this evidence.

## VI.  DEFENDANTS' MOTIONS IN LIMINE TO EXCLUDE CERTAIN EVIDENCE OFFERED BY THE GOVERNMENT

### A.  Defendants' motion in limine to exclude statements that do not meet the requirements of Federal Rule of Evidence 801(d)(2)(E)

On January 17, 2019, defendant Jackson filed a motion in limine to exclude statements that do not meet the requirements of Federal Rule of Evidence 801(d)(2)(E). Dkt. 868 ("MIL 17"). Defendants Montoya and Vega joined in the motion. Dkts. 888, 908. The government filed an opposition on January 24, 2019. Dkt. 910 ("Opp'n 17").

Rule 801(d)(2)(E) provides that an out of court statement is not hearsay if it "was made by the party's coconspirator during and in furtherance of the conspiracy." Fed. R. Evid. 801(d)(2)(E). Statements made "in furtherance of the conspiracy" "must further the common objectives of the conspiracy or set in motion transactions that are an integral part of the conspiracy." United States v. Yarbrough, 852 F.2d 1522, 1535 (9th Cir. 1988). Such statements "include statements made to: (1) 'induce enlistment or further participation in the group's activities'; (2) 'prompt further action on the part of the conspirators'; (3) 'reassure members of a conspiracy's continued existence'; (4) 'allay a coconspirator's fears'; and (5) 'keep coconspirators abreast of an ongoing conspiracy's activities[.]'" U.S.A. v. Sahakian, No. CR 02-938 (A) VAP, 2008 WL 11383346, at *2 (C.D. Cal. July 28, 2008) (citing Yarbrough, 852 F.2d at 1535–36 (listing types of co-conspirator statements)).

Before a court will admit a non-hearsay co-conspirator statement, the government must show, "by a preponderance of the evidence that a conspiracy existed at the time the statement was made; the defendant had knowledge of, and participated in, the conspiracy; and the statement was made in furtherance of the conspiracy." United States v. Bowman, 215 F.3d 951, 960–61 (9th Cir. 2000) (citing Bourjaily v. United States, 483 U.S. 171, 175 (1987)). "The statement must be considered but does not by itself establish . . . the existence of the conspiracy or participation in it." Fed. R. Evid. 801. Additional evidence must be offered to establish the

existence of the conspiracy, as well as the defendant's participation in it.  United States v. Gordon, 844 F.2d 1397, 1402 (9th Cir. 1988) (holding that a taped conversation between conspiracy co-defendants sufficiently established the existence of a conspiracy and the declarant's participation in it).  However, pursuant to Federal Rule of Evidence 104, the Court may consider evidence that would not be admissible when the Court makes its preliminary determination.  Bourjaily, 483 U.S. at 178 ("[Rule 104] on its face allows the trial judge to consider any evidence whatsoever, bound only by the rules of privilege.").

Defendants argue that the Court should hold a hearing, prior to trial, to determine whether the out of court statements that the government intends to offer properly constitute co-conspirator statements under Rule 801(d)(2)(E).  MIL 17 at 4, 6.  Defendants voice concern that some statements may meet the requirements as to one defendant, but not to others.   Id. at 1.  Defendants thus contend that a pretrial hearing is necessary in order for the Court to determine the "admissibly for each statement – made by each declarant—against each defendant" in this multi-defendant trial.  Id. at 4.

The government opposes a pretrial hearing to determine the admissibility of co-conspirator statements.  Relying on United States v. Arbelaez, 719 F.2d 1453 (9th Cir. 1983), the government argues that defendants are not entitled to a pretrial hearing.  Opp'n at 3.  "It is within the Court's discretion to provisionally or conditionally admit the co-conspirator statements subject to them later being connected up at the conclusion of the presentation of evidence," at which time the Court would make its preliminary finding.  Id. at 1.  The government also represents that were the Court to hold a pretrial hearing, it could take weeks for the government to present all the co-conspirator statements, along with its evidence.  "Such a pre-trial evidentiary hearing would require the government to present hundreds of transcripts and over half dozen hours of recordings it intends to utilize at trial, and require witnesses, including cooperating witnesses, to testify about the conversations in order to establish the conspiracy charged in Count One and defendants' connection to it."  Id.  The government adds that, in light of the hundreds of pages of pleadings and exhibits already put before the Court, the Court can already find the existence of the conspiracy, as well as each defendants' participation in it.  Id. at 5.

In this Circuit, the procedure employed to lay the foundation for admitting co-conspirator statements is within the Court's discretion.  Arbelaez, 719 F.2d at 1460.  Courts have employed different methods to determine whether the foundational elements of Rule 801 have been met.  See United States v. Joyce, No. 14-CR-00607-PJH-4, 2017 WL 895563, at *5 (N.D. Cal. Jan. 20, 2017), aff'd sub nom. United States v. Guillory, 740 F. App'x 554 (9th Cir. 2018) (identifying three different methods employed by courts to lay the foundation for co-conspirator statements, including the use of a pretrial James hearing); see also Charles A. Wright et. al., 30B Federal Practice & Procedure § 6777 (2018 ed.) (introducing the varied processes that different circuits employ to determine the admissibility of co-conspirator statements).

Here, the Court finds that "[a] pretrial hearing on foundational issues . . . is neither necessary nor practical considering the scope of this case." Sahakian, 2008 WL 11383346, at *2. The government represents that it would require weeks to present all the co-conspirator statements that it seeks to offer into evidence, along with the independent evidence, which lay the foundation for the existence of a conspiracy. Opp'n at 1. The Court will already hear this evidence during the upcoming month-long trial. It need not hear it twice. For this reason, the Court will allow the government to provisionally offer the alleged co-conspirator statements and to establish the foundation for the co-conspirator statements during the course of trial. If, at the end of trial, the government fails to establish the requisite foundation, the Court will then strike the statements or declare a mistrial. United States v. Batimana, 623 F.2d 1366, 1369 (9th Cir. 1980) ("[i]t is clear in this circuit that the statements may be admitted provisionally subject to later motions to strike"); see also United States v. Spawr Optical Research, Inc., 685 F.2d 1076, 1083 (9th Cir. 1982) ("The district court admitted the challenged statements subject to a motion to strike if the Government failed to provide sufficient proof, a procedure we have upheld."). If the Court concludes that only certain defendants participated in the conspiracy, or that certain statements may only be admitted against certain defendants, the Court will issue rulings in accordance with such individualized findings.

Accordingly, defendants' motion requesting a pretrial hearing to determine the admissibility of out-of-court statements pursuant to Rule 801 is **DENIED**.

## B.    Defendants' motion in limine to exclude unconfronted out of court statements

On January 17, 2019, defendant Jackson also filed a motion in limine to exclude unconfronted out of court statements. Dkt. 867 ("MIL 18"). Defendants Montoya and Vega joined in the motion. Dkts. 888, 908. Defendants specifically move to exclude unconfronted, out-of-court statements of alleged co-conspirators and of the government's confidential informant CS-1. Id. at 1. These statements are captured on the audio recordings that the government intends to offer at trial. Id. Citing the Supreme Court's cases Crawford v. Washington, 541 U.S. 36 (2004), Davis v. Washington, 547 U.S. 813 (2006), and Michigan v. Bryant, 562 U.S. 344 (2011), defendants argue that CS-1's and the co-conspirator's statements are "testimonial" in nature, and accordingly must be excluded, pursuant to the Confrontation Clause. "Under the circumstances that the recordings were made for the primary purpose of creating an out of court substitute for trial testimony[, they] should not be admitted against [defendants] absent [defendants'] ability to confront and cross-examine the declarants." MIL 18 at 6.

The government filed an opposition to defendants' motion on January 24, 2019. Dkt. 893 ("Opp'n 18"). The government argues that the out-of-court co-conspirator statements are admissible and not subject to the Confrontation Clause. Id. at 1–2. The government acknowledges, however, that while the Ninth Circuit has permitted the admission of recorded conversations between a defendant and a confidential informant, the statements of the

confidential informant could not be offered for the truth of the matter asserted. Id. at 2. Instead, these statements could be offered "only to give context to what [the defendant] said." Id. at 3 (quoting United States v. Valerio, 441 F.3d 837, 844 (9th Cir. 2006). The government accordingly now represents that it "will only offer CS-1's statements as context and not for their truth." Opp'n 18 at 3. The government also suggests that the Court should give a limiting instruction that explains this scope. Id. The government suggests that this instruction should be given before the government's case-in-chief and at the close of the case. Id.

The Confrontation Clause of the Sixth Amendment states: "In all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." U.S. Const. amend. VI. The Confrontation Clause thus excludes all testimonial out-of-court statements, unless witnesses are unavailable and defendants had prior opportunity to cross-examine them. Crawford, 541 U.S. at 59. "However, co-conspirator statements are not testimonial and therefore beyond the compass of Crawford's holding." United States v. Allen, 425 F.3d 1231, 1235 (9th Cir. 2005) (citing Crawford, 541 U.S. at 56 (explaining that "statements in furtherance of a conspiracy" "by their nature were not testimonial")); see also United States v. Crozier, 268 F. App'x 604, 606 (9th Cir. 2008) (admitting audio recordings because "[t]he statements on the audiotape were made during and in furtherance of the conspiracy"). Accordingly, the Court declines to exclude the co-conspirator statements, as captured on the government's audio recording.[12]

With regard to the recorded statements of CS-1, the government now represents that it will only offer the statements as context to the defendants' and/or co-conspirators' statements— not for their truth. Opp'n 18 at 3. As the Ninth Circuit has repeatedly ruled, this renders the evidence admissible when an appropriate limiting instruction is given. See Valerio, 441 F.3d at 844; Barragan, 871 F.3d at 705.[13] Rule 802 only excludes out-of-court statements when offered for the truth of the matter asserted. Fed. R. Evid. 802. The Confrontation Clause also "does not bar the use of testimonial statements for purposes other than establishing the truth of the matter asserted." Crawford, 541 U.S. at 59 n.9 (citing Tennessee v. Street, 471 U.S. 409, 414 (1985)).

---

[12]      While the Court rules that the recorded statements of co-conspirators may be admitted because they are not subject to the Confrontation Clause, this ruling of course hinges on the Court's preliminary finding, by a preponderance of the evidence, that a conspiracy existed. See Section VI (A).

[13]      In Barragan, the Court instructed the jury as follows: "Throughout the course of the trial, you have heard recordings that included statements made by government informants. It is the statements of those speaking to the government informants that is to be considered by you as evidence. Such statements should be considered by you in relation to all the other instructions I provide, and you may give such statements as much weight as you think they deserve. Statements of government informants are not to be considered for their truth, but only to put the statements of those with whom they were talking into context." 871 F.3d at 704–05.

The Court thus finds that, with a proper limiting instruction, CS-1's out-of-court statements are admissible for the purpose of providing context. The Court directs the parties to meet and confer over the limiting instruction to be offered at trial for this purpose.

In accordance with the foregoing, defendants' motion to exclude unconfronted, out of court statements is **DENIED**.

### C.      Defendants' motion in limine to preclude guilty pleas as admissible to prove any charge in this case

On January 17, 2019, defendant Jackson filed a motion in limine to preclude the government's use of guilty pleas to prove any charge in this case. Dkt. 869 ("MIL 19"). Defendant Vega joined in the motion. Dkts. 908. The government filed an opposition on January 24, 2019. Dkt. 894 ("Opp'n 19").

Defendants argue that, pursuant to Crawford v. Washington, 541 U.S. 36 (2003), the Court should not permit jurors to draw inferences of the existence of a conspiracy based on a statements made in connection with a plea agreement. MIL 19 at 1. Defendants request that the Court provide certain jury instructions either before or during the testimony of an alleged accomplice or co-conspirator who has pled guilty. Defendants seek a further instruction that the jurors are to consider the nature of the offense that an individual pled guilty to solely as a description of the nature of the felony that the witness was convicted of, and not as reflecting on the merits of the case or on the allegations against defendants. Id. at 2. Defendants also request that the Court preclude any type of law enforcement "expert" opinion based on individuals who have previously pled guilty.

The government agrees that a guilty plea of one defendant cannot be used as substantive evidence against other defendants, but argues that a guilty plea can be used for limited purposes during trial, including to impeach the government's own witness or as the basis of an expert's opinions. Opp'n 19 at 3; see Fed. R. Evid. 607 ("Any party, including the party that called the witness, may attack the witness's credibility."); United States v. Johnson, 587 F.3d 625, 635 (4th Cir. 2009) (Although "Crawford forbids the introduction of testimonial hearsay as evidence in itself, [ ] it in no way prevents expert witnesses from offering their independent judgments merely because those judgments were in some part informed by their exposure to otherwise inadmissible evidence" . . . but a witness cannot be "used as little more than a conduit or transmitter for testimonial hearsay."); United States v. Gomez, 725 F.3d 1121, 1129 (9th Cir. 2013) (citing Johnson with approval).

Given that statements associated with plea agreements may be used for a limited purpose during trial, the Court **DENIES** defendants' motion without prejudice to defendants renewing the motion in the event the government seeks to use a guilty plea to prove any charge in this case.

**D.**    **Defendants' motion in limine to prohibit law enforcement officers, including proposed "experts," from testifying about the truthfulness of out of court statements**

On January 17, 2019, defendant Jackson filed a motion in limine to prohibit law enforcement officers, including the government's proposed experts, from testifying about the truthfulness of out-of-court statements. Dkt. 870 ("MIL 20"). Defendants Montoya and Vega joined in the motion. Dkts. 888, 908. Defendants argue that such evidence impermissibly bolsters the credibility of those statements and invades the province of the jury. <u>Id.</u> at 2 (citing <u>United States v. Sanchez-Lima</u>, 161 F.3d 545 (9th Cir. 1998)). The government filed an opposition on January 24, 2019, stating that it is aware of this standard and does not intend to ask any law enforcement witness if another witness was telling the truth. Dkt. 904 ("Opp'n 20").

In light of the government's representations that it does not intend to elicit testimony from law enforcement officers about the truthfulness of out-of-court statements, the Court **DENIES** defendants' motion as moot.

**E.**    **Defendants' motion in limine to exclude testimony and out of court statements of cooperating witnesses who have received payment or other consideration**

On January 17, 2019, defendant Jackson filed a motion in limine to preclude testimony from government witnesses who have been paid or provided other consideration for their cooperation. Dkt. 871 ("MIL 21"). In the alternative, Jackson seeks a limiting instruction regarding the testimony or out-of-court statements of such witnesses. <u>Id.</u> at 8. Defendants Montoya and Vega joined in the motion. Dkts. 888, 908. The government filed an opposition on January 24, 2019. Dkt. 895 ("Opp'n 21").

It is well-settled law that cooperating witnesses routinely receive some form of consideration from the government and that this practice is proper. <u>See</u> <u>United States v. Flores</u>, 172 F.3d 695, 700 (9th Cir. 1999) (noting that no court had ever excluded evidence on the ground that the government offered leniency to witnesses in exchange for their testimony and citing six circuit courts that have held that the government is not subject to 18 U.S.C. § 201(c)(2), which prohibits bribery of public officials and witnesses). Defendants acknowledge that this practice is condoned and widespread, but argue that this provides the government with a "huge advantage over the defense in its choice of mechanisms through which to cultivate potential witnesses." MIL 21 at 4. This imbalance, according to defendants, gives rise to due process and equal protection violations. <u>Id.</u> at 5–6. However, defendants cite no authority for precluding testimony from cooperating witnesses merely because they received some form of consideration from the government.

The Court declines to depart from well-settled law allowing the government to provide immunity, benefits, or other forms of consideration to cooperating witnesses. The parties shall meet and confer regarding limiting instructions on this issue. Accordingly, defendants' motion is **DENIED**.

### F.  Defendants' motion in limine for measures to prevent jury prejudice with regard to the handling of defendants

On January 17, 2019, defendant Jackson filed a motion in limine to implement measures at trial to prevent undue prejudice to Jackson that would result from the jury's perception that he is dangerous. Dkt. 872 ("MIL 22"). Defendants Montoya and Vega joined in the motion. Dkts. 888, 908. Specifically, defendants seek measures to assure that, in the event defendants are shackled during trial, the jury will neither see nor hear that they are shackled. Id. at 2. Defendants also seek an order or instruction from the Court that the dress and conduct of the Marshals and other security personnel in the courtroom shall be such as to prevent the jury from forming the perception that defendants are dangerous. Defendants argue that physical restraints can cause jury prejudice and reverse the presumption of innocence. MIL 22 at 2 (citing Spain v. Rushen, 883 F.2d 712, 722 (9th Cir. 1989)). Defendants cite no authority dictating how security personnel ought to dress and conduct themselves during trial. The government filed an opposition on January 24, 2019. Dkt. 911 ("Opp'n 22").

The Court finds that it is appropriate to restrain defendants based on their criminal history, and based on their alleged involvement with the Mexican Mafia, which the Ninth Circuit has described as "an extraordinarily violent organized criminal enterprise." United States v. Shryock, 342 F.3d 948, 972 (9th Cir. 2003); United States v. Fernandez, 388 F.3d 1199, 1245 (9th Cir. 2004), modified, 425 F.3d 1248 (9th Cir. 2005) (affirming the use of shackles where "the court [is] persuaded by compelling circumstances that some measure was needed to maintain the security of the courtroom"; and (2)"the court . . . pursue[s] less restrictive alternatives before imposing physical restraints"). The fact that defendants are shackled must be concealed from the jury. To this effect, the Court has elected to try this case in the complex criminal courtroom, which is designed to prevent the jury from seeing shackles. In addition, defendants' hands will be free, and the shackles will be padded to avoid noise. Defendants are to wear civilian clothes. Defendants will otherwise be treated in a manner consistent with this Court's procedures in other Mexican Mafia cases, and the Court will follow the security protocols set in place by the United States Marshal Service.

Accordingly, the Court **GRANTS** defendants' request to conceal defendants' shackles from the jury.

G. **Defendants' motion in limine to exclude jail writings and testimony about jail writing**

On August 16, 2018, the government disclosed to defendants its intention to offer into evidence jail writings seized on or about March 21, 2012 from the fecal matter of Ronquillo Gabriel, an inmate at San Quentin State Prison.  On January 17, 2019, defendant Jackson filed a motion to exclude these jail writings.  Dkt. 874 ("MIL 23").  Defendants Montoya and Vega joined in the motion.  Dkts. 888, 908.  Defendants argue that "the writing are inadmissible, unsigned, undated, multi-level hearsay."  Id. at 1.  Defendants also moves to exclude any testimony about these writings.  Id.  The government opposes the motion.  Dkt. 906 ("Opp'n 23").

The jail writings seized are comprised of eight kites, which appear to discuss the defendants in this case and the Project they allegedly orchestrated.[14]  See Opp'n 23 at 4–6.  At the time the government disclosed its intention to offer this evidence into the record, the government represented that the kites were written by inmate Rodriguez, who is not a defendant in this case and who is now deceased and therefore unavailable as a witness.  MIL 23 at 2.  Defendants therefore objected to the evidence on the grounds that the kites do not constitute co-conspirator statements because Rodriquez has not been linked to this conspiracy, which makes the writing inadmissible under the rule against hearsay.  Id. at 2–4.

In the opposition that it filed on January 24, 2019, the government states that, "in the last week," the government has now determined that defendant Vega—and not Rodriquez— "is most likely the author of the kites."  Opp'n 23 at 2.  The government does not explain what new information it discovered to draw this new determination.  However, the government states that the kites can be admitted into evidence because they constitute party admissions and/or co-conspirator statements.  Id. at 11–12.  The government explains that it anticipates calling multiple witnesses to lay the foundation for admitting the kites, including a confidential informant ("CS-6") who was close to Vega.  Id. at 8.  CS-6 will testify that he is familiar with Vega's handwriting, and that "it is like (possibly up to 85%) that the kites are in Vega's handwriting."  Id. at 9.  He will also testify, *inter alia*, that Vega told CS-6 about the kites.  Id.  The government states that it will also call experts to testify about the process by which inmates send kites, who is allowed to send them, and why this communication was important for the charged conspiracy.  Id. at 8.

Additionally, although the government contends that the kites are admissible as party admissions under FRE 801(d)(2)(A) because Vega likely authored them, the government also argues that, "in light of the evidence of the conspiracy and the clear connection between the kites and the conspiracy, the precise identity of the kites' author is not critical to their

---

[14]     Although the government has reproduced the messages contained in the kites for the Court, the messages contain many code words and aliases which the Court cannot decode.

admission." <u>Id.</u> at 13 (citing <u>United States v. Gil</u>, 58 F.3d 1414, 1419–20 (9th Cir. 1995) ("But there is no real mystery as to the participants in the drug conspiracy here or the meaning of the ledger entries themselves. The testimony of the handwriting expert that Montoya was 'probably' the author of the Abuelitos ledger, combined with circumstantial evidence that Montoya wrote the ledger entries, provides an adequate foundation for admitting the ledger as an admission by Montoya.")).

In light of the fact that the government's position on who authored these notes has changed in the time since defendants filed their motion, the Court cannot rule on defendants' motion as filed. At oral argument, defense counsel for Vega stated that he plans to hire a handwriting expert to review the kites. The Court therefore **RESERVES** judgment on the admissibility of this evidence until the time that Vega's expert reviews them. The Court will order supplemental briefing and/or hold an evidentiary hearing if so required.

## VII.  CONCLUSION

In accordance with the foregoing, the Court **GRANTS** the government's motions in limine to admit evidence pertaining to defendants Rodriguez-Landa and Apodaca and to admit evidence pertaining to Jackson.

The Court **GRANTS** in part and **DENIES** in part the government's motion in limine to admit evidence of defendants' prior convictions, pursuant to Federal Rule of Evidence 609.

The Court **RESERVES** ruling on the government's motions in limine to admit Montoya's 2001 methamphetamine convictions under Federal Rule of Evidence 404(b) and to preclude the introduction of inadmissible hearsay.

The Court **DENIES** *without prejudice* the government's motions in limine to preclude calling CS-1 for the primary purpose of impeaching him; to preclude improper impeachment of cooperating witnesses; to preclude questioning on matters subject to the law enforcement sensitive qualified evidentiary privilege; and to preclude (1) admission of any late or undisclosed reciprocal discovery and (2) admission at trial of any unnoticed affirmative defenses.

The Court **GRANTS** defendants' motion for additional peremptory challenges and defendants' motion in limine to exclude the expert testimony of Tyler Call, subject to a more robust showing of relevancy by the government.

The Court **RESERVES** ruling on defendants' motion for a preliminary jury instruction and defendants' motion in limine to exclude jail writings and testimony about jail writing.

The Court **DENIES** *without prejudice* defendants' request for notice of proposed trial logistics; defendants' motion in limine for advanced notice of the government's exhibits,

witnesses to be called, and topics to be covered during a trial week; and defendants' motions in limine to exclude or limit expert testimony from Victor Vazquez; to exclude or limit testimony from John Feeney, John Castanedo, and Jose Urita; to exclude statements that do not meet the requirements of Federal Rule of Evidence 801(d)(2)(e); to exclude unconfronted out of court statements; to preclude guilty pleas as admissible to prove any charge in this case; to exclude testimony and out of court statements of cooperating witnesses who have received payment or other consideration; and defendants' motion in limine for measures to prevent jury prejudice in regard to the handling of defendants.

The Court **DENIES** *as moot* defendants' motion in limine to prohibit law enforcement officers from testifying about the truthfulness of out of court statements and defendants' motion in limine to exclude or limit expert testimony from Brendan Hanratty.

IT IS SO ORDERED.

|   | 00 | : | 00 |
|---|---|---|---|
| Initials of Deputy Clerk | | CMJ | |